| |
|---|
| EVOQUA WATER TECHNOLOGIES LLC |
| Plaintiff, |
| v. |
| M.W. WATERMARK, LLC; MICHAEL GETHIN, individually; DANIEL JANISSE, individually; and JAMES VANDE WEGE, individually |
| Defendants. |

Civil Action No. _____

# COMPLAINT[1]

Plaintiff Evoqua Water Technologies LLC ("Evoqua") files this Complaint and demand for jury trial against Defendants M.W. Watermark, LLC ("Watermark"), Michael Gethin, Daniel Janisse, and James Vande Wege. Evoqua brings this action to enforce the terms of a Permanent Injunction that was ordered by this Court against Watermark (formerly J-Parts, LLC) in 2003, and which Watermark and Gethin have willfully and deliberately violated by continuing to misappropriate Evoqua's trade secret information and by continuing to infringe Evoqua's trademarks. Evoqua seeks a judgment holding Mr. Gethin and Watermark in contempt of court in light of its violations of the 2003 Permanent Injunction, and sanctions, including Evoqua's attorneys' fees, along with a suitable multiplier. Evoqua also brings claims against Watermark

---

[1] Because the subject matter at issue concerns highly sensitive, confidential and proprietary information, this public version of the complaint and several of the attachments include some redactions. Un-redacted versions are being filed contemporaneously herewith along with a motion to file these materials under seal.

and Mr. Gethin for copyright infringement under the Copyright Act, trademark infringement and false advertising under the Lanham Act, misappropriation of trade secrets under Michigan's Uniform Trade Secrets Act, as well as conversion, and unfair competition under Michigan common law. Evoqua also brings claims against its former employees Mr. Janisse and Mr. Vande Wege, individually, for misappropriation of trade secrets and breach of contract.

## PARTIES

1.      Evoqua is a limited liability corporation organized and existing under the laws of the State of Delaware and having a place of business at 2155 112th Avenue, Holland, MI 49424.

2.      Upon information and belief, Defendant Watermark is a limited liability company organized and existing under the laws of the state of Michigan and having its principal place of business at 4660 136th Ave. Holland, MI 49424.

3.      Upon information and belief, Defendant Michael Gethin ("Gethin") is the President of Watermark. Prior to his employment by Watermark, he was a Customer Service Representative for spare parts for Evoqua's predecessor, U.S. Filter/JWI, Inc. ("U.S. Filter"). Upon information and belief, Mr. Gethin resides in Grand Rapids, Michigan.

4.      Upon information and belief, Defendant Daniel Janisse is currently employed as a purchasing manager by Watermark. Prior to his employment by Watermark, Mr. Janisse was a Procurement Manager for Evoqua. Upon information and belief, Defendant Mr. Janisse is a resident of Zeeland, Michigan.

5.      Upon information and belief, Defendant James Vande Wege is currently employed as a sales and customer service representative for Watermark. Prior to his employment by Watermark, Mr. Vande Wege was an Aftermarket Sales Representative for Evoqua. Upon information and belief, Defendant Mr. Vande Wege is a resident of Holland,

Michigan.

## JURISDICTION AND VENUE

6.     This is an action to enforce the terms of a 2003 Permanent Injunction entered by the Court against Defendants Watermark and Mr. Gethin that was entered in connection with the settlement of a prior litigation between Evoqua's predecessor, U.S. Filter, and Defendants Watermark and Mr. Gethin. Because Watermark and Mr. Gethin are in contempt of this Court for violating the terms of this Court's Permanent Injunction order, jurisdiction and venue are proper in this Court.

7.     This is also an action for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*; trademark infringement and false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); unfair competition under Michigan common law; trade secret misappropriation under Michigan's Uniform Trade Secrets Act, MCL § 445.1901 *et seq*; unjust enrichment under Michigan common law; and breach of contract under Michigan common law.

8.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. §1338 (a)-(b); 17 U.S.C. § 101 *et seq.* (Copyright Act); and 15 U.S.C. § 1125(a) (Lanham Act).

9.     This Court has supplemental subject matter jurisdiction over the Michigan state law claims pursuant to 28 U.S.C. § 1367(a). The claims arising under Michigan law asserted herein are so related to the Copyright Act and Lanham Act claims as to form part of the same case or controversy.

10.     This Court has personal jurisdiction over Watermark with respect to all claims and causes of action asserted herein because Watermark has its headquarters in Holland, Michigan and therefore has continuous and systematic contacts within this jurisdiction.

11.     This Court has personal jurisdiction over the individual defendants because they

have committed, and continue to commit, tortious acts in this District and have breached and continue to breach valid contracts in this District. Furthermore each of the individual defendants reside within this District.

12.     Venue in this action is proper in this Court because this is the judicial district in which both Evoqua and all Defendants reside, can be found, and transact business. Venue is therefore appropriate under 28 U.S.C. § 1391 (b) and (c) as well as 28 U.S.C. § 1400 (a).

## STATEMENT OF FACTS

### Background of Evoqua

13.     Evoqua was incorporated and began operations in the late 1970s as a Michigan corporation named JWI, Inc. The corporation was founded to pursue the novel business concept of selling filter presses to industrial and commercial customers to enable them to comply with then newly-promulgated environmental regulations mandating the pretreatment of industrial waste water streams. The name "JWI" was derived from the first and middle initials of its founder, John William VandenBos.

14.     Evoqua is the successor in interest to U.S. Filter/JWI, Inc. ("U.S. Filter ") and all property formerly owned by U.S. Filter, and is the successor in interest to all contracts with or duties formerly owed to U.S. Filter.

15.     For more than 35 years, Evoqua and its predecessors in interest (collectively referred to as Evoqua) have been engaged continuously in the business of marketing, manufacturing and selling filter presses and other dewatering equipment. For much of that period, Evoqua has marketed products under a variety of names beginning with the prefix "J-," including such names as J-PRESS® filter presses and J-MATE® sludge dryers.

16.     Evoqua has been for many years, and continues to be, the market leader in the

sale of filter presses, sludge dryers, and other dewatering equipment. As testament to the success of Evoqua's sales and marketing efforts and the value of its trademarks and trade secret information, there are more than 9,000 J-PRESS® filter presses and more than 1,000 J-MATE® dryers operating in the field today. These products are installed and operating on five continents and in more than forty countries.

## Background of Watermark

17.     Watermark was founded in 2003 by Michael Gethin, a former employee of Evoqua's predecessor, U.S. Filter.  Mr. Gethin abruptly resigned from U.S. Filter in 2003 to begin a company he had secretly formed called J-Parts, LLC ("J-Parts").  As a result of litigation between U.S. Filter, Mr. Gethin and J-Parts, Mr. Gethin was forced to rename J-Parts as Watermark.

18.     J-Parts was renamed as M.W. Watermark, LLC in October 2003 under the terms of a settlement agreement between J-Parts and U.S. Filter.

19.     Upon information and belief, Watermark is the successor in interest to J-Parts and assumed all of the rights and responsibilities of J-Parts, including its obligations pursuant to the settlement agreement between J-Parts and U.S. Filter as well as J-Parts' obligations pursuant to the Final Judgment and Permanent Injunction that resulted from the prior litigation between U.S. Filter and J-Parts.

## Prior Litigation Between U.S. Filter, J-Parts and Gethin

### The 2003 Complaint

20.     On August 29, 2003 U.S. Filter filed a complaint against J-Parts and its President, Gethin, in the United States District Court for the Western District of Michigan, Southern

Division ("the 2003 Complaint").

21.     A true and accurate copy of the 2003 Complaint is attached hereto as Exhibit A and Evoqua hereby incorporates by reference all of the factual allegations as set forth in the 2003 Complaint and its Exhibits as if fully restated herein.

22.     In the 2003 Complaint, U.S. Filter sought redress for a scheme by Mr. Gethin and J-Parts to misappropriate significant aspects of the value of U.S. Filter's business, including its trademarks, trade secrets, and other proprietary information. The misappropriated information had been entrusted to Mr. Gethin in reliance on promises he made in his employment agreements as well as his fiduciary duties under law to use the information solely for purposes of his employment for U.S. Filter.

23.     Among other things, while still employed by U.S. Filter, Mr. Gethin downloaded voluminous and highly valuable confidential and trade secret information from U.S. Filter's computer system and used that information to compete directly against U.S. Filter for sales of spare parts for U.S. Filter equipment.

24.     As part of their scheme to misappropriate U.S. Filter's trade secret information and goodwill, J-Parts and Mr. Gethin deliberately adopted a business name that was confusingly similar to U.S. Filter's trademarks. J-Parts and Mr. Gethin's actions were calculated to cause and did cause customers to falsely believe that J-Parts was associated with U.S. Filter's well-established business.

25.     The 2003 Complaint identified several of U.S. Filter's trademarks that were being infringed by J-Parts and Mr. Gethin, including J-PRESS® (U.S. Trademark Reg. No. 1,259,184) for the marketing and sale of filter presses and spare parts for such equipment; J-MATE® (U.S. Trademark Reg. No. 1,384,160) for the marketing and sale of sludge dryers and spare parts for

such equipment; and J-VAP® (U.S. Trademark Reg. No. 2,114,763) for the marketing and sale of a hybrid J-PRESS® filter press and spare parts for such equipment (collectively "the Evoqua Trademarks").

26.     On April 10, 2003, while still serving as U.S. Filter's Customer Service Representative for spare parts, Mr. Gethin incorporated a new company called "J-Parts," using a name that Mr. Gethin knew was associated with U.S. Filter's products and that U.S. Filter had been considering for use in selling its spare parts.

27.     Mr. Gethin deliberately used the J-Parts name to cause confusion among U.S. Filter's customers and compete unfairly with U.S. Filter.  For example, Mr. Gethin sent an email introducing J-Parts to many of U.S. Filter's longstanding customers.  In his email, Mr. Gethin did not truthfully state that there was no connection whatsoever between U.S. Filter, J-Parts, and Mr. Gethin (who had been U.S. Filter's spare parts Customer Service Representative for many years). Instead, he deceptively told  potential customers (in conjunction with using the misleading "J-Parts" name) to "update" their records with the J-PARTS, LLC name "as your preferred supplier of spare parts, upgrades, rebuilds and retrofits for Water & Wastewater equipment." *See* Exhibit E to the 2003 Complaint.  Several U.S. Filter customers to whom Gethin sent the email contacted U.S. Filter to inquire whether J-Parts was affiliated with U.S. Filter.

28.     J-Parts and Mr. Gethin were improperly using the "J-Parts" name in connection with the sale of replacement parts for U.S. Filter's J-PRESS®, J-MATE®, and J-VAP® line of products in an effort to cause consumer confusion with respect to the Evoqua Trademarks and in a manner that diluted the distinctiveness of the Evoqua Trademarks.  J-Parts and Mr. Gethin were also competing unfairly with U.S. Filter by misappropriating the valuable goodwill associated with the Evoqua Trademarks.

29.     Prior to his departure from U.S. Filter, and without U.S. Filter's knowledge, Mr. Gethin also downloaded or arranged for the downloading to computer disks of large quantities of U.S. Filter's proprietary information. The proprietary information that Mr. Gethin caused to be downloaded included at least the following:

a.  Key contact and equipment information from the serial history for all J-Press filter presses and 800 J-Mate dryers then existing in the field;

b.  A listing of all spare parts sold by U.S. Filter, sorted by gross margin;

c.  A listing of customer data (*i.e.*, each customer name and address, contact person's name, telephone number and e-mail address) for all reseller customers, which are the accounts most likely to generate multiple or repeat sales and higher volume sales;

d.  Copies of numerous proposals made to customers for U.S. Filter spare parts sales;

e.  Many templates that U.S. Filter used for the form of its communications to customers; and

f.  Detailed U.S. Filter spare parts price lists with per part margin information.

30.     Upon information and belief, Mr. Gethin also stole and unlawfully used other proprietary U.S. Filter information prior to, and potentially after, his departure from U.S. Filter. The stolen information included trade secrets such as records, papers, drawings, pictures, computer information, and other tangible documentation containing such information, to compete against U.S. Filter for spare parts sales.

31.     As a condition of his employment for U.S. Filter, Mr. Gethin was required to

8

execute a Confidentiality and Development Agreement, a copy of which was attached as Exhibit

D to the 2003 Complaint. Paragraph 2 of that agreement provides as follows:

> Non-disclosure and Non-Use of Confidential Information. You shall not, directly or indirectly, disclose to any third party or use Confidential Information, other than in connection with your employment duties for the Company, unless such disclosure or use is specifically consented to in writing by an officer of the Company. Your obligations of non-disclosure and non-use shall continue following the termination of your employment with the Company, except that it will not continue following such termination with respect to Confidential Information which is or becomes generally known to the public or is generally disclosed to third parties through no action on your part.

32.    Mr. Gethin's Confidentiality and Development Agreement defines "Confidential

Information" to include the following:

> all trade secrets and proprietary information, including, without limitation, Developments, reports, analyses, *financial information*, plans, proposals, processes, sketches, photographs, graphs, software, *databases (including, without limitation, customer relationship and management databases)*, *drawings*, specifications, equipment, samples, *customer lists, supplier and vendor lists, and information relating to costs, pricing, profits, markets, sales, products*, market studies and forecasts, *pricing policies and data*, sales plans, *customers and customer prospects, opportunities, and buying patterns*, business plans, competitive analyse*s, agreements with customers, suppliers, vendors*, and others, marketing and dealership agreements, and servicing and training programs and arrangements.

(Emphasis added).

33.    Mr. Gethin's Confidentiality and Development Agreement further required him to

return all of U.S. Filter's proprietary information upon termination of his employment:

> Records; Delivery Upon Termination. All records, papers, drawings, pictures, computer information, and other tangible documentation relating to the business or activities of the Companies, whether in hardcopy or electronic format, and whether or not prepared or made by you, are property of the Companies. You will immediately deliver to the Company any such property in your possession or under your control upon termination of your employment or earlier if you are directed to do so by Company management. In particular and without limitation, at the termination of employment you will immediately deliver to the Company all such materials in your possession or under your control containing or relating to Confidential Information or Developments.

20627602.2

## Injunction and Settlement

34. On September 12, 2003, U.S. Filter filed a motion for a preliminary injunction, seeking to enjoin J-Part and Mr. Gethin from continuing their unlawful scheme to misappropriate U.S. Filter's trade secrets and infringe the Evoqua Trademarks, as outlined in the 2003 Complaint. Attach hereto as Exhibit B is a true and correct copy of U.S. Filter's 2003 Brief in Support of it Motion for a Preliminary Injunction, supporting declarations, and associated exhibits, the factual allegations of which are incorporated by reference as if fully restated herein.

35. On October 20, 2003, Mr. Gethin and J-Parts filed their Answer to the Complaint, admitting to material allegations of the Complaint. *See, e.g.* Answer at ¶ 58:

> Admitted that Defendant Gethin downloaded information from Plaintiff. In further, Gethin states that he has no accurate recollection about the precise inventory of materials enumerated in the subparts of this allegation and, therefore, he denies these allegations.

A true and accurate copy of Mr. Gethin and J-Parts' Answer from the 2003 Litigation is attached hereto as Exhibit C and Mr. Gethin and J-Parts' admissions are incorporated herein by reference in their entirety as if fully stated herein.

36. On October 24, 2003, U.S. Filter, Mr. Gethin, and J-Parts filed a stipulated Preliminary Injunction and proposed order with the Court. A true and correct copy of the stipulated Preliminary Injunction is attached hereto as Exhibit D and is incorporated herein by reference. Pursuant to the Preliminary Injunction, Mr. Gethin and J-Parts agreed, among other things, that Mr. Gethin and J-Parts would be enjoined from: (1) using the "J-Parts" name or any other name incorporating the prefix "J-," (2) using the Internet domain name "www.jpartsllc.com," (3) using, disclosing, or disseminating any U.S. Filter proprietary information, including the proprietary information identified in the Complaint. Mr. Gethin and J-Parts further agreed, among other things, to destroy all advertising and materials bearing the

10

prefix "J-," and to deliver to U.S. Filter all documents, data, files and other materials including U.S. Filter's proprietary information.

37. On October 24, 2003, the Honorable Judge David W. McKeague so-ordered the Parties' stipulated Preliminary Injunction. A true and correct copy of the signed Preliminary Injunction Order is attached hereto as Exhibit E and is incorporated herein by reference.

38. On December 16, 2003, U.S. Filter, Mr. Gethin, and J-Parts filed a stipulated Final Judgment Including Permanent Injunction and proposed Order with the Court. A true and correct copy of the stipulated Final Judgment Including Permanent Injunction is attached hereto as Exhibit F and is incorporated herein by reference. The proposed Final Judgment Including Permanent Injunction permanently enjoined J-Parts (by then M.W. Watermark) and Mr. Gethin based on the same conditions presented in the Preliminary Injunction.

39. On December 22, 2003, the Honorable Judge David W. McKeague so-ordered the Parties' stipulated Final Judgment Including Permanent Injunction ("the 2003 Permanent Injunction"). A true and correct copy of the 2003 Permanent Injunction is attached hereto as Exhibit G and is incorporated herein by reference. Among other things, the 2003 Permanent Injunction included the following injunctions:

> 1. Defendants are ENJOINED, permanently, from using Plaintiff U.S. Filter/JWI, Inc.'s ("USF/JWI's") trademarks J-PRESS®, J-MATE®, and J-VAP® ("USF/JWI's Trademarks") and colorable imitations thereof and any other designs, designations or indicia in a manner that is likely to cause confusion, mistake or deception with respect to USF/JWI's trademark rights....

> 2. Defendants are ENJOINED, permanently, from using, disclosing, or disseminating any USF/JWI Proprietary Information. For purposes of this Injunction, the term "USF/JWI Proprietary Information" means USF/JWI information not generally available to the public that relates to the business or activities of, or belongs to, or is controlled or possessed by USF/JWI. The USF/JWI Proprietary Information includes, without limitation, information obtained by Defendants from USF/JWI's Enterprise Resource Planning ("ERP") System, serial histories, reports, analyses, financial information, plans, proposals, processes, sketches, photographs, graphs, software, databases (including,

11

customer relationship management databases), drawings, specifications, equipment, samples, customer lists, supplier and vendor lists, contact lists, and information relating to costs, pricing, profits, markets, sales, products, market studies and forecasts, pricing policies and data, sales plans, customers and customer prospects, opportunities, and buying patterns, business plans, competitive analyses, agreements with customers, suppliers, vendors, and others, marketing and dealership agreements, and servicing and training programs and arrangements.

40. On or about December 2003, U.S. Filter, Mr. Gethin, and J-Parts (by then M.W. Watermark) agreed to a Settlement Agreement, resolving the issues in dispute in the 2003 Litigation ("the 2003 Settlement Agreement"). A true and correct copy of the 2003 Settlement Agreement is attached hereto as Exhibit H and its terms are incorporated herein by reference as if fully restated herein.

## Watermark and Gethin Violate the Terms of the 2003 Permanent Injunction

41. Both Mr. Gethin and Watermark were obligated under the terms of the 2003 Permanent Injunction to refrain from both infringing the Evoqua Trademarks and to further refrain from misappropriating Evoqua's confidential and trade secret information.

42. Since the conclusion of the 2003 Litigation, Watermark and Mr. Gethin have repeatedly and willfully violated the terms of the 2003 Permanent Injunction by infringing the Evoqua Trademarks and misappropriating Evoqua's confidential and trade secret information.

43. Mr. Gethin and Watermark have breached the 2003 Permanent Injunction by continuing to misappropriate Evoqua's confidential and trade secret information, as explained below. For example, Mr. Gethin and Watermark have received confidential and trade secret information from Evoqua's former employees now working for Watermark and have used such confidential and trade secret information for the benefit of Watermark. Watermark and Mr. Gethin, with the aid of their employees, have misappropriated Evoqua's trade secret and confidential information including, but not limited to, the following: (1) Evoqua's trade secret

12

customer information and business opportunities, including contacting an Evoqua customer in connection with an on-site rebuild opportunity with █████████████████, (2) Evoqua's trade secret supplier lists, including Evoqua's supplier list for certain Fiberglass Reinforced Plastics ("FRP") tank suppliers, and (3) Evoqua's confidential and trade secret training materials.

44.  Also, as further detailed below, Mr. Gethin and Watermark have repeatedly infringed the Evoqua Trademarks by, among other things: (1) launching a new sludge dryer product under the trademark "DryMate," which infringes upon Evoqua's J-Mate ® trademark for its line of sludge dyers, (2) using the Evoqua Trademarks in the Google AdWords program so as to show a Watermark advertisement as the first Google search result when a Google user searches one or more of the Evoqua Trademarks, (3) inserting the Evoqua trademarks into its various web pages as "metatags," such that online search engines will index Watermark's web pages among relevant search results to be listed in response to a search engine search containing the Evoqua Trademarks.

45.  Each of the foregoing acts, as described in this Complaint, represents a clear breach of the 2003 Permanent Injunction, for which sanctions against Mr. Gethin and Watermark are appropriate.

### Watermark Continues to Misappropriate Evoqua's Trade Secret Information

#### Watermark Misappropriates Evoqua's Trade Secret Information Relating to the ██████████████ Rebuild Opportunity

46.  Watermark has systematically recruited and hired Evoqua's key employees.

47.  In 2008, Terry Morley, a Mechanical Engineer for Evoqua, resigned from Evoqua and now works for Watermark.

48.  In 2010, Dan Lerz, a Mechanical Engineer for Evoqua, resigned and went to work for Watermark.

13

49.     In 2012, David Meier, a Mechanical Engineer for Evoqua, resigned and went to work for Watermark.

50.     In 2012, Jerry Fan, an Electrical Engineer for Evoqua, resigned and went to work for Watermark.

51.     In 2012, James Deisenga, an Aftermarket Representative for Evoqua, resigned and now works for Watermark.

52.     In 2012, Tom Zuniga, a Mechanical Designer for Evoqua, resigned and went to work for Watermark.

53.     In 2012, Andrew Hagen, Evoqua's Application Engineer, resigned and now works for Watermark.

54.     In 2014, Thomas Richards, a Manufacturing Associate at Evoqua  and former Supply Chain Management ("SCM") Team Leader, resigned and went to work for Watermark.

55.     In 2015, Daniel Janisse, a SCM Procurement Manager for Evoqua, resigned and went to work for Watermark.

56.     In 2015, James Vande Wege, Evoqua's Aftermarket Representative, resigned and went to work for Watermark.

57.     Upon information and belief one or more of the employees that left Evoqua and began working at Watermark since the 2003 Litigation settlement have carried away Evoqua's confidential, proprietary, and trade secret information and have been giving such information to Watermark and/or using that information for the benefit of Watermark.

58.     In or about the winter of 2014 and 2015, Evoqua became aware of a valuable on-site rebuild opportunity for ████████████████████. The ████████████ opportunity was not publicly known and became available to Evoqua through private communications with

14

███████████████ representatives. Evoqua employees, including James Vande Wege, immediately began working on a proposal for the rebuild project that would meet ███████ ████████ needs. At the time, the ████████████ opportunity was the only active aftermarket rebuild opportunity for Evoqua ████████████ .

59.     In or about February 2015, Mr. Vande Wege resigned from Evoqua and began working at Watermark.

60.     Upon information and belief, as a condition of his employment with Evoqua, Mr. Vande Wege signed a Confidentiality and Development Agreement with Evoqua, whereby Mr. Vande Wege agreed, among other things, not to disclose to any third party or use any Confidential Information other than in connection with his duties on behalf of Evoqua.

61.     Upon information and belief, Mr. Vande Wege's Confidentiality and Development Agreement defined Confidential Information as including any information not generally available to the public from sources outside of Evoqua that relates to the business or activities of, or belongs to, or is controlled or possessed by Evoqua.

62.     In or about April of 2015, Evoqua became aware that Jim Vande Wege had contacted Evoqua's sales agent ████████████████████████████████ to inform them that he had moved to Watermark and that Watermark was capable of providing the same parts and services as Evoqua.

63.     In an email from Mr. Vande Wege to Evoqua's ██████ sales agent dated April 3, 2015, Mr. Vande Wege states: "I would like to introduce you to the company I now work at. We are a filter press manufacture *and we specialize in on site rebuilds*." (emphasis added). A complete copy of the April 3, 2015 email is attached hereto as Exhibit I.

64.     Upon information and belief, Mr. Vande Wege disclosed the ████████████

15

opportunity to Watermark and contacted Evoqua's customer with the intention of stealing the ████████████ opportunity from Evoqua.

65.   Upon information and belief, Mr. Vande Wege was induced to disclose the existence of the ████████████ opportunity and the substance of Evoqua's draft proposal to ████████████ by Watermark and its executives, including Gethin.

66.   The existence of the ████████████ opportunity constituted Confidential Information pursuant to Mr. Vande Wege's Confidentiality and Development Agreement because the opportunity was information that was not generally available to the public from sources outside of the Company.

67.   The existence of the ████████████ opportunity constituted trade secret information belonging to Evoqua. The ████████████ opportunity was not generally known outside of Evoqua. The ████████████ opportunity provided an economic advantage to Evoqua because Evoqua had an exclusive opportunity to submit a proposal to ████████████ while the opportunity remained a secret. Furthermore, the ████████████ opportunity was the subject of reasonable steps to maintain secrecy such as the requirement that employees working on the ████████████ opportunity, including Mr. Vande Wege, were previously required to sign a Confidentiality and Development Agreement with Evoqua.

68.   Evoqua's draft proposal to ████████████ constituted Confidential Information pursuant to Mr. Vande Wage's Confidentiality and Development Agreement because the details of Evoqua's proposal to ████████████ were not generally available to the public from sources outside of the Company.

69.   Evoqua's draft proposal to ████████████ constituted trade secret information belonging to Evoqua. Evoqua's draft proposal to ████████████ was not generally known

16

outside of Evoqua. Evoqua's draft proposal to ████████████ provided an economic advantage to Evoqua because it included Evoqua's analysis of the requirements, costs, and profitability of Evoqua's proposal. Furthermore, Evoqua's draft proposal to ████████████ was the subject of reasonable steps to maintain secrecy such as the requirement that employees working on Evoqua's draft proposal to ████████████, including Mr. Vande Wege, were previously required to sign a Confidentiality and Development Agreement with Evoqua which specifically included confidential proposals, among other things.

### Watermark Misappropriates Evoqua's Trade Secret Supplier List

70.     On or about June 5, 2015 two Evoqua employees overheard another Evoqua employee, Mark Otto, engaged in a telephone discussion with what appeared to be former Evoqua employee Daniel Janisse, who had begun working for Watermark. Through the course of the telephone discussion, Mr. Otto appeared to disclose confidential supplier information to Mr. Janisse. The two Evoqua employees who believed they had overheard an improper conversation between Mr. Otto and Mr. Janisse immediately reported what they had overheard to their managers.

71.     Based on the reported discussion between Mr. Otto and Mr. Janisse, Evoqua reviewed recent emails between Mr. Otto and Mr. Janisse, which revealed significant evidence of trade secret misappropriation.

72.     Attached hereto as Exhibit J is a true and correct copy of an April 9, 2015 email thread between Mr. Otto and Mr. Janisse. In that email thread Mr. Janisse flatly asks Mr. Otto "who were the primary FRP Suppliers that Evoqua is currently engaged with"? Mr. Janisse's email to Mr. Otto also includes a list of Fiberglass Reinforced Plastics ("FRP") tank suppliers that he believes were on Evoqua's supplier list based on his recollection of his time with Evoqua.

Mr. Janisse also inquired whether his recollection of Evoqua's supplier list is accurate. In his response email, Mr. Otto confirms that "[y]our list is our primary sources." Mr. Otto continued "I haven't done much in FRP tanks but those that you listed are who I have files on."

73.    After discovering the disclosure of Evoqua's supplier list to Mr. Janisse by Mr. Otto, Evoqua's employees Patrick O'Connor and Mary Dougherty confronted Mr. Otto on June 5 and again on June 9, 2015 regarding his disclosure of Evoqua's confidential and trade secret information. Through the course of these conversations, Mr. Otto admitted to disclosing Evoqua's supplier list to Mr. Janisse.

74.    In view of his improper disclosure of Evoqua's confidential and trade secret information, Mr. Otto was terminated from Evoqua on June 9, 2015.

75.    As a condition of their employment with Evoqua, both Mr. Janisse and Mr. Otto signed Confidentiality and Development Agreements with Evoqua, whereby both Mr. Janisse and Mr. Otto agreed, among other things, not to disclose to any third party or use any Confidential Information other than in connection with their duties on behalf of Evoqua. A true and correct copy of Mr. Otto's Confidentiality and Development Agreement is attached hereto as Exhibit K. Upon information and belief, the terms of Mr. Janisse's Confidentiality and Development Agreement are identical to Mr. Otto's agreement in all material respects.

76.    Mr. Otto's Confidentiality and Development Agreement required him not to disclose to third parties or use Evoqua's Confidential Information, as stated below:

> **Non-Disclosure and Non-Use of Confidential Information.** You shall not, directly or indirectly, disclose to any third party or use Confidential Information, other than in connection with your employment duties for the Company, unless such disclosure or use fs specifically consented to in writing by an officer of the Company. Your obligations of non-disclosure and non-use shalt continue following the termination of your employment with the Company.

77.    Mr. Otto's Confidentiality and Development Agreement defined Confidential

Information as follows:

> any information not generally available to the public from sources outside the Companies which relates to the business or activities of, or belongs to, or is controlled or possessed by the Companies; any information of others which the Companies have a duty to keep confidential; and all trade secrets and proprietary information, including, without limitation, Developments, reports, analyses, financial information, plans, proposals, processes, sketches, photographs, graphs, software, databases (including, without limitation, customer relationship management databases), drawings, specifications, equipment, samples, customer lists, supplier and vendor lists, and Information relating to costs, pricing, profits, markets, sales, products, market studies and forecasts, pricing policies and data, sales plans, customers and customer prospects, opportunities, and buying patterns, business plans, competitive analyses, agreements with customers, suppliers, vendors, and others, marketing and dealership agreements, and servicing and training programs and arrangements.

78.     Upon information and belief, Mr. Janisse used Evoqua's confidential and trade secret supplier list to identify and solicit suppliers on behalf of Watermark.

79.     Upon information and belief, Mr. Janisse was induced by Watermark to solicit Evoqua's trade secret information from Mr. Otto.

80.     Evoqua's FRP tank supplier list constitutes confidential information under both Mr. Janisse and Mr. Otto's Confidentiality and Development Agreements because the supplier list constitutes "information not generally available to the public from sources outside the Companies" and furthermore because "supplier and vendor lists" are specifically defined to be confidential information.

81.     Evoqua's FRP tank supplier list constitutes trade secret information belonging to Evoqua. Evoqua's FRP tank supplier list was not generally known outside of Evoqua, as evidenced by Mr. Janisse's need to consult Mr. Otto to confirm his recollection of the information he gained while working for Evoqua. Evoqua's FRP tank supplier list provides an economic advantage to Evoqua because it indicates the identity of Evoqua's FRP tank suppliers who have prior knowledge of Evoqua's FRP tank requirements and procedures and represents

19

years of Evoqua's business experience in identifying and vetting its preferred FRP tank suppliers. Furthermore, Evoqua's FRP tank supplier list was the subject of reasonable steps to maintain secrecy such as the requirement that all Evoqua employees are required to sign a Confidentiality and Development Agreement with Evoqua which specifically identifies "supplier and vendor lists" as confidential information that is protected against disclosure to third parties.

### Watermark Misappropriates Evoqua's Trade Secret Training Materials

82.     Upon information and belief, Watermark has misappropriated Evoqua's internal, trade secret training materials.

83.     Evoqua's Global Product Manager – Dewatering, Robert Bosgraaf, periodically conducts internal Evoqua employee training regarding advancement in water technology, water purification techniques, and the technical aspects of Evoqua's products and business.

84.     One such internal Evoqua presentation was entitled "How Does a Filter Press Work?" and was presented by Mr. Bosgraaf. A true and correct copy of the "How Does a Filter Press Work?" presentation is attached hereto as Exhibit L.

85.     Another internal Evoqua presentation was entitled "J-Press," and was presented by Mr. Bosgraaf in or about 2003. A true and correct copy of a slide from the "J-Press" presentation is attached hereto as Exhibit M.

86.     Evoqua's internal training presentations, including the "How Does a Filter Press Work?" and "J-Press" presentation, are not generally available to the public. Such presentations are prepared and intended for Evoqua's internal consumption at training sessions for Evoqua employees and sales representatives only. For that reason, Evoqua's internal training presentations, including the "How Does a Filter Press Work?" presentation and "J-Press" presentation, are not provided to anyone other than Evoqua employees and sales representatives.

87.     Evoqua's internal training presentations, including the "How Does a Filter Press Work?" and "J-Press" presentations, provide a significant economic advantage in the water treatment field because they serve as a comprehensive library of materials to quickly and efficiently train Evoqua employees and represent the written embodiment of Mr. Bosgraaf's extensive knowledge, experience, and expertise within the water treatment industry.

88.     Evoqua's internal training presentations, including the "How Does a Filter Press Work?" and "J-Press" presentation, are also the subject of reasonable steps to maintain secrecy. Evoqua training presentations are only made to Evoqua employees and sales representatives on an as-needed basis. Copies of internal presentations are not shared outside of Evoqua and may only be accessed on Evoqua's internal computer network with a valid Evoqua user login. Evoqua also requires each employee to sign a standard Confidentiality and Development Agreement, such as those signed by Mr. Gethin, Mr. Vande Wege, Mr. Otto, and Mr. Janisse. Those agreements specifically identify "training programs" among the materials that Evoqua considers to be confidential.

89.     The following cross-sectional diagrams of a filter presses appears on slide 11 of the "How Does a Filter Press Work?" and on a slide of the "J-Press" presentation.



90.     On August 19, 2015, Mr. Bosgraaf indirectly received a Watermark marketing email with the subject line "Filter Plates and Cloths for Most Makes and Models." A true and correct copy of the August 19, 2015 Watermark email is attached hereto as Exhibit N.

91.     Included within the August 19, 2015 email, Mr. Bosgraaf recognized an image from the "How Does a Filter Press Work?" and "J-Press" presentations. The image, which is described as an "Acid Wash Process Diagram" is shown below, above the original filter press images from Evoqua's internal "How Does a Filter Press Work?" and "J-Press" presentations.



92.     Upon information and belief, a copy of Evoqua's internal "How Does a Filter

Press Work?" and/or Evoqua's "J-Press" presentation was taken by at least one former Evoqua employee that is now working for Watermark.

93.     Upon information and belief, Watermark copied the graphics from Evoqua's internal "How Does a Filter Press Work?" and/or Evoqua's "J-Press" presentation for use within its marketing materials.

94.     Upon information and belief, Watermark continues to use materials from Evoqua's internal "How Does a Filter Press Work?" and/or Evoqua's "J-Press" presentation and other trade secret training materials for its own purposes.

<u>Watermark Infringes Evoqua's Copyrights</u>

**Watermark Infringes the "How Does a Filter Press Work?" and/or "J-Press" Copyrights**

95.     On October 21, 2015, Evoqua registered its copyright for the "How Does a Filter Press Work?" presentation, including the images appearing on slide 11 of that presentation. Attached hereto as Exhibit O is a true and correct copy of Evoqua's U.S. Copyright Registration No. VAu 1-223-330 for the "How Does a Filter Press Work?" presentation.

96.     Upon information and belief, and as previously described above, Watermark's marketing email with the subject line "Filter Plates and Cloths for Most Makes and Models" includes an image of a filter press diagram that is a copy and/or derived from Evoqua's copyrighted "How Does a Filter Press Work?" and "J-Press" presentations.

**Watermark Infringes Evoqua's JWI Brochure Copyright**

97.     In or about October of 2015, several Evoqua employees, including Mr. Bosgraaf, recognized certain images belonging to Evoqua within Watermark's 2013 Filter Press Brochure ("the Watermark 2013 Brochure"). A true and correct copy of the Watermark 2013 Brochure is attached hereto as Exhibit P. Upon further review it was determined that the image of the 1200

20627602.2

mm portable filter press appearing on page 5 of the Watermark 2013 Brochure was simply a retouched image of Evoqua's 1200 mm portable filter press that appeared in a JWI, Inc. brochure ("the JWI Brochure"). A true and correct copy of Evoqua's JWI Brochure is attached hereto as Exhibit Q.

98.    Below is a comparison of the portable filter press appearing on page 5 of the Watermark 2013 Brochure and the portable filter press appearing on page 7 of Evoqua's JWI Brochure. The image from the Watermark 2013 Brochure is simply a re-touched copy of the image from Evoqua's JWI Brochure. For example, the subject of the images, the angle of the images, the shadows appearing on the images appear to be identical. However, upon information and belief, a Watermark employee has altered the image from Evoqua's JWI Brochure by giving the image a darker hue, editing out the JWI logo, and by digitally inserting a Watermark insignia.




U.S. Filter (1985)                          Watermark - 2013

## Watermark Infringes Evoqua's Drawing Copyrights

99.    In or about October of 2015, Evoqua was contacted by a potential customer that had purchased a used Evoqua filter press. The potential customer was inquiring about purchasing some replacement hydraulic parts for the press. In order to facilitate the inquiry, the potential customer provided the below drawing for the hydraulic module assembly from a manual that the potential customer said he had purchased from Watermark, a true and correct

24

copy of which is included among the drawings attached hereto as Exhibit R.



100. Upon receiving the Hydraulic Module Assembly drawing, Evoqua employees recognized that it is a copy of Evoqua's proprietary hydraulic module assembly drawing, a true and correct copy of which is included among the drawings attached hereto as Exhibit S. As shown below, Watermark's hydraulic module assembly drawing bears a striking resemblance to Evoqua's hydraulic module assembly drawing.

20627602.2



**Evoqua's Hydraulic Module Drawing**    **Watermark's Hydraulic Module Drawing Copy**

101.    After receiving the hydraulic module assembly drawing, Evoqua inquired further with the potential customer, who indicated that the hydraulic module assembly drawing came from an operation manual that he had purchased from Watermark.  Specifically, the manual included a listing of available filter press spare parts, along with spare part drawings.  Several additional drawings from the manual were also copied from Evoqua's proprietary parts drawings, as shown below.  The additional Watermark drawings are attached hereto as Exhibit R and the original Evoqua drawings are attached hereto as Exhibit S.

| Drawing from Watermark Manual | Original Evoqua Drawing |
|---|---|



| Drawing from Watermark Manual | Original Evoqua Drawing |
| --- | --- |



102. Upon information and belief the above-referenced drawings found in Watermark's filter press manual were copied from Evoqua's copyrighted drawings based on materials that were taken from Evoqua and given to Watermark by one or more former Evoqua employees.

**Watermark Falsely Advertises Itself as an Evoqua Original Equipment Manufacturer**

103. In or about June 2015, Evoqua became aware that Watermark was making material, false statements about its replacement part business on its web page. Attached hereto as Exhibit T is a true and correct copy of Watermark's web page, as it appeared on or about June 29, 2015. As shown below, Watermark claimed on its web page that it is an original equipment manufacturer ("OEM") for several brands of equipment, including J-Press, JWI, U.S. Filter, Perrin, and Siemens Water Technologies.



104. Watermark has never been an OEM for J-Press, JWI, U.S. Filter, Perrin, or Siemens Water Technologies. Watermark's statement on its web page to the contrary was literally false.

105. Upon information and belief, the above, false statements were placed on Watermark's home page to deliberately deceive replacement part customers into believing that Watermark is an OEM manufacturer for Evoqua's brands and products, thereby unfairly

20627602.2

diverting sales for replacement parts for these brands from Evoqua to Watermark.

106. After being confronted by Evoqua's in-house counsel regarding the false statements on its web page, Watermark has since corrected the false statements on its web page. Below is a portion of Watermark's web page as it appeared on November 13, 2015.



**Watermark Infringes the Evoqua Trademarks**

**Watermark Improperly Uses the Evoqua Trademarks in
Google AdWords and Metatags on Its Web Pages**

107. On July 23, 2015, Evoqua's Senior Counsel and Head of Intellectual Property, Gary Ganzi, Esq., conducted a Google search for Evoqua's J-Mate® trademark. The top citation result for the search was a paid advertisement for Watermark, stating "Find Gas-Fired Continuous Sludge Dryers at MW Watermark." The third search result was a blog entry by Watermark dated April 10, 2015, titled "J-Mate® versus DryMate™ Continuous Sludge Dryer…" The fourth search result was titled "Sludge Dryer Parts – MW Watermark" – "We Stock Parts for Siemens/US filter/JWI J-Mate Dryers! Contact M.W. Watermark…"

108. A true and correct copy of Mr. Ganzi's Google search and results is attached hereto as Exhibit U.

109. Upon information and belief, Watermark employed metatags based on and including the Evoqua Trademarks on its April 10, 2015 blog entry referring to one or more Evoqua Trademarks in order to direct Google searches that include the Evoqua Trademarks as search terms towards Watermark's blog.

110. Upon information and belief, Watermark deliberately misstated the nature of its products in the fourth search result because Watermark does not stock parts for Siemens, US Filter, JWI, or J-Mate dryers and is not a supplier of genuine Evoqua parts. As such, Watermarks statement to the contrary is literally false.

111. Upon information and belief, Watermark has used the Evoqua Trademarks in Google's AdWords platform to cause Watermark advertisements to appear when Google users search for one or more of the Evoqua Trademarks.

112. Upon information and belief, Watermark's use of the Google AdWords platform and metatags based on the Evoqua Trademarks is likely to cause confusion as to the affiliation, connection or association of Watermark with Evoqua, or as to the origin, sponsorship, or approval of Watermark's goods and services by causing Watermark's advertisements to appear in response to a search string containing one or more of the Evoqua Trademarks.

**Watermark's DryMate Trademark Infringes Evoqua's J-Mate® Trademark**

113. On or about June 7, 2015, Watermark introduced a new gas-fired continuous sludge dryer to the marketplace that it dubbed the "DryMate" Sludge Dryer. Attached hereto as Exhibit V is a true and correct copy of a press release issued by Watermark in connection with its new DryMate product line.

114. Upon information and belief, Watermark deliberately chose the "DryMate" name for its sludge dryer to improperly create a likelihood of consumer confusion between the

DryMate name and Evoqua's registered J-Mate® trademark for its own line of sludge dryers.

115.    Upon information and belief, Watermark's use of the DryMate trademark is likely to cause confusion as to the affiliation, connection or association of Watermark with Evoqua, or as to the origin, sponsorship, or approval of Watermark's goods and services because Watermark's DryMate trademark is confusingly similar to Evoqua's J-Mate® trademark, which are both used in connection with similar goods, namely, sludge dryers.

## COUNT I – CONTEMPT
### (Against Gethin and Watermark)

116.    Evoqua restates and incorporates the above paragraphs of this Complaint as if set forth fully herein.

117.    Watermark and Mr. Gethin, through the above-described actions, have willfully and deliberately violated the terms of the 2003 Permanent Injunction by at least infringing the Evoqua Trademarks and knowingly receiving, disclosing, using, and otherwise misappropriating Evoqua's confidential and trade secret information.

118.    Watermark and Mr. Gethin's willful violation of the 2003 Permanent Injunction has caused and will continue to cause irreparable injury and damage to Evoqua. Evoqua has no adequate remedy at law and the balance of public interest favors enforcing the 2003 Permanent Injunction and compensating Evoqua for the losses it has sustained in connection with Watermark's violation of the 2003 Permanent Injunction.

119.    The damage to Evoqua resulting from Watermark and Mr. Gethin's violation of the 2003 Permanent Injunction will be difficult to quantify and, in all likelihood, will be impossible to fully quantify with precision. Such damages include, at a minimum, (a) the competitive advantages wrongfully taken from Evoqua and imparted to Watermark; (b) future lost sales and/or other business opportunities gained by Watermark and lost by Evoqua; (c)

32

future lost profits; (d) loss of reputation, goodwill, and customer relationships; and (e) Evoqua's attorneys' fees in being forced to bring this action to enforce the terms of the 2003 Permanent Injunction.

120.    Given the fact that Watermark and Mr. Gethin have willfully and deliberately violated the terms of the 2003 Permanent Injunction, Evoqua requests that a reasonable multiplier be applied to its compensatory damages as a sanction for Watermark and Mr. Gethin's extraordinary behavior in this case and that Evoqua be awarded an additional amount sufficient to ensure future compliance by Watermark and Gethin with the terms of the 2003 Permanent Injunction.

## COUNT II – TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114
### (Against Gethin and Watermark)

121.    Evoqua restates and incorporates the above paragraphs of this Complaint as if set forth fully herein.

122.    Evoqua is the owner of all right, title, and interest in and to the Evoqua Trademarks.

123.    On information and belief, Watermark and Mr. Gethin have used and are currently using one or more of the Evoqua Trademarks and/or colorable imitations of the Evoqua Trademarks that are confusingly similar to the Evoqua Trademarks in commerce on or in connection with the sale, offering for sale, distribution or advertising of dewatering products for use in waste water treatment and disposal including, but not limited to, using the Evoqua Trademarks in the Google AdWords program, as metatags on its web pages, and by using the "DryMate" mark in connection with the sale of sludge dryers.

124.    Watermark and Mr. Gethin's use of the Evoqua Trademarks is likely to cause confusion, mistake, or deception as to Watermark and Mr. Gethin's connection, affiliation, or

association with Evoqua; and the origin, sponsorship, or approval of Watermark and Mr. Gethin's products, services, or commercial activities by Evoqua.

125. Evoqua has been damaged by Watermark and Mr. Gethin's use of the Evoqua Trademarks and the DryMate mark and is likely to be further damaged by Watermark and Mr. Gethin's continued use of these designations. In particular, Watermark and Mr. Gethin's use of the Evoqua Trademarks and the DryMate mark is likely to cause the Evoqua Trademarks to lose their significance as an indicator of origin.

126. Upon information and belief, Watermark and Mr. Gethin used colorable imitations of, and designations substantially identical to, the Evoqua Trademarks with full knowledge of Evoqua's rights. Therefore, Watermark has willfully infringed such rights.

## COUNT III - MISAPPROPRIATION OF TRADE SECRETS
### (Against Watermark, Gethin, Vande Wege, and Janisse)

127. Evoqua restates and incorporates the above paragraphs of this Complaint as if set forth fully herein.

128. Watermark gained access to Evoqua's trade secret information through the various key employees that it has recruited away from Evoqua.

129. Evoqua's trade secret information, as described herein, including information relating to the ███████████████ opportunity, Evoqua's supplier lists, and Evoqua's internal training information, constitutes trade secrets as defined by the Michigan Uniform Trade Secrets Act, MCL § 445.1901 *et seq.* and Michigan Common Law.

130. All of Evoqua's employees, including the former employees listed above, owe Evoqua a duty, pursuant to the Michigan Uniform Trade Secrets Act and the common law of Michigan, to neither use nor disclose Evoqua's trade secret information acquired in the course of their employment for the benefit of anyone other than Evoqua.

34

131.     Watermark knew or had reason to know that Evoqua's proprietary information, as described herein, including information relating to the ▮▮▮▮▮▮▮▮▮▮ opportunity, Evoqua's supplier list, and Evoqua's internal training information, constitutes trade secrets as defined by the Michigan Uniform Trade Secrets Act, MCL § 445.1901 *et seq.* and Michigan Common Law.

132.     Upon information and belief, Watermark used improper means to obtain Evoqua's trade secret information including, but not limited to, soliciting the disclosure of such information from Evoqua's current and former employees, and through inducing Evoqua's former employees to breach the terms of their Confidentiality and Development Agreements with Evoqua.

133.     Upon information and belief, Watermark and Messrs. Gethin, Vande Wege, and Janisse have disclosed and used Evoqua's trade secret information in connection with the competitive activities of Watermark.   Absent an injunction, Watermark, and Messrs. Gethin, Vande Wege, and Janisse will continue to disclose and use Evoqua's trade secret information for their own benefit.

134.     Evoqua is entitled to an injunction that prevents Watermark and Messrs. Gethin, Vande Wege, and Janisse from disclosing and/or using Evoqua's trade secret information and to eliminate the commercial advantage inevitably derived by Watermark from Evoqua's trade secret information.

135.     Watermark and Messrs. Gethin, Vande Wege, and Janisse's unauthorized disclosure and/or use of Evoqua's trade secret information has caused and will continue to cause irreparable injury and damage to Evoqua.   Evoqua has no adequate remedy at law and the balance of public interest favors granting Evoqua the injunctive relief it seeks.

136. The damage to Evoqua resulting from Watermark and Messrs. Gethin, Vande Wege, and Janisse's misappropriation of Evoqua's trade secrets and other proprietary and confidential information will be difficult to quantify and, in all likelihood, will be impossible to fully quantify with precision. Such damages include, at a minimum, (a) the competitive advantages wrongfully taken from Evoqua and imparted to Watermark; (b) future lost sales and/or other business opportunities; (c) future lost profits; and (d) loss of reputation, goodwill, and customer relationships.

### COUNT IV - FALSE ADVERTISING IN VIOLATION OF
### THE LANHAM ACT, 15 U.S.C. § 1125(a)
### (Against Gethin and Watermark)

137. Evoqua restates and incorporates the above paragraphs of this Complaint as if set forth fully herein.

138. Watermark and Mr. Gethin are making misleading statements on Watermark's web page and other marketing materials, including by claiming that it is an OEM for Evoqua products and equipment.

139. Watermark and Mr. Gethin's misleading statements have actually deceived or have the capacity to deceive a substantial portion of the intended audience.

140. Watermark and Mr. Gethin's misleading statements are material because they are likely to influence the purchasing decisions for those purchasing de-watering equipment.

141. Watermark and Mr. Gethin's misleading statements have caused injury to Evoqua and unless enjoined will irreparably injure Evoqua's goodwill and erode its market share, causing declining sales.

142. Watermark and Mr. Gethin's misleading statements on its web page and other marketing materials have travelled in interstate commerce.

20627602.2

143.    Watermark and Mr. Gethin's conduct constitutes false advertising in violation of the Lanham Act, § 43(a), 15 U.S.C. § 1125(a).

144.    Evoqua has suffered and will continue to suffer irreparable harm as a result of Watermark and Mr. Gethin's misleading advertising.

145.    As described in 15 U.S.C. § 1117, Evoqua is entitled to treble damages as a result of Watermark's violation of 15 U.S.C. § 1125(a).

146.    This is an exceptional case as described in 15 U.S.C. § 1117 that entitles Evoqua to its reasonable attorneys' fees.

## COUNT V - COPYRIGHT INFRINGEMENT
### (Against Watermark and Gethin)

147.    Evoqua restates and incorporates the above paragraphs of this Complaint as if set forth fully herein.

148.    Watermark and Mr. Gethin have infringed and are continuing to infringe Evoqua's copyrighted works, including images from Evoqua's "How Does a Filter Press Work?" and "J-Press" presentations, images from Evoqua's JWI Brochure, and Evoqua's copyrighted shop drawings (collectively "the Evoqua Copyrights") by, *inter alia*, reproducing, distributing, publicly performing, and/or publicly displaying the Evoqua Copyrights.  As alleged above, Watermark and Mr. Gethin's marketing materials and parts drawings are substantially similar to the Evoqua Copyrights and are derived from the Evoqua Copyrights in violation of Evoqua's exclusive rights at least under 17 U.S.C. § 101, *et seq.* without any authorization or other permission from Evoqua.

149.    Upon information and belief, Watermark and Mr. Gethin's infringement of the Evoqua Copyrights has been deliberate, willful, and in utter disregard of Evoqua's rights.

150.    Watermark and Mr. Gethin have realized unjust profits, gains, and advantages as

a proximate result of its infringement.

151. Watermark and Mr. Gethin will continue to realize unjust profits, gains, and advantages as a proximate result of its infringement as long as such infringement is permitted to continue.

152. As a direct and proximate result of Watermark and Mr. Gethin's willful copyright infringement, Evoqua has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill. Evoqua is entitled to recover from Watermark and/or Mr. Gethin, in amounts to be determined at trial, the damages it has sustained and will sustain, and any gains, profits, and advantages obtained by Watermark and Mr. Gethin as a result of their acts of infringement and use and publication of the copyrighted materials.

153. Evoqua is entitled to an injunction restraining Watermark and Mr. Gethin from engaging in any further such acts in violation of the Copyright laws of the United States. Unless Watermark and Mr. Gethin are enjoined and prohibited from infringing Evoqua's copyrights, Watermark will continue to infringe Evoqua's copyrights.

154. Evoqua is further entitled to recover from Watermark and Mr. Gethin damages, including attorneys' fees and costs it has sustained and will sustain, and any gains, profits, and advantages obtained by Watermark and Mr. Gethin as a result of their acts of infringement as described above. At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained by Evoqua, but will be established according to proof at trial.

155. Evoqua is also entitled to recover statutory damages for Watermark and Mr. Gethin's willful infringement of its registered copyrights.

## COUNT VI – BREACH OF CONTRACT
### (Against Gethin, Vande Wege, and Janisse)

156. Evoqua restates and incorporates the above paragraphs of this Complaint as if set

forth fully herein.

157.　Messrs. Gethin, Vande Wege, and Janisse's all agreed in their respective employment agreements with Evoqua to maintain the confidentiality of Evoqua's confidential and proprietary information and to return any and all embodiments of Evoqua's confidential and proprietary information to Evoqua upon termination of his employment.

158.　Messrs. Gethin, Vande Wege, and Janisse received valuable consideration for their promises to maintain the confidentiality of Evoqua's confidential and proprietary information.

159.　Evoqua relied on the promises of Messrs. Gethin, Vande Wege, and Janisse in continuing their respective employments with Evoqua and in trusting each of them with Evoqua's confidential and proprietary information.

160.　Each of Messrs. Gethin, Vande Wege, and Janisse materially breached his employment agreements with Evoqua by taking, disclosing to third parties, and/or using Evoqua's confidential and proprietary information for the benefit of Watermark.

161.　Messrs. Gethin, Vande Wege, and Janisse's breaches of contract have caused and continue to cause irreparable injury and damages to Evoqua. Evoqua has no adequate remedy at law for such breaches of contract and the balance of interests and the public interest favor granting Evoqua the injunctive relief that it seeks. In addition, the property involved in Messrs. Gethin, Vande Wege, and Janisse's breaches of their employment agreements is unique property.

162.　Evoqua has suffered damages as a result of Messrs. Gethin, Vande Wege, and Janisse's breaches of contract. The damages are difficult to fully quantify but include, at a minimum, (a) the loss of confidentiality regarding Evoqua's confidential and proprietary information; (b) the competitive advantages wrongfully imparted to Mr. Gethin and Watermark;

(c) lost sales and other business opportunities; (d) future lost sales and/or other business opportunities; (e) current and future loss of reputation and goodwill.

## COUNT VII – CONVERSION
### (Against Watermark, Gethin, Vande Wege, and Janisse)

163.    Evoqua restates and incorporates the above paragraphs of this Complaint as if set forth fully herein.

164.    Watermark, and Messrs. Gethin, Vande Wege, and Janisse have willfully and wrongfully detained and retained Evoqua's electronic and paper documents and materials and have failed to return them to Evoqua.

165.    By willfully detaining and retaining Evoqua's electronic and paper documents and materials that constitute unique property, Watermark, and Messrs. Gethin, Vande Wege, and Janisse have converted such unique property to their own use and purposes.

166.    As a direct and proximate result of Watermark, and Messrs. Gethin, Vande Wege, and Janisse's wrongful conversion, Evoqua has sustained damages.

167.    Pursuant to MCL § 600.2919a, Watermark, and Messrs. Gethin, Vande Wege, and Janisse are liable for conversion.

## COUNT VIII – UNFAIR COMPETITION UNDER MICHIGAN COMMON LAW
### (Against Gethin and Watermark)

168.    Evoqua restates and incorporates the above paragraphs of this Complaint as if set forth fully herein.

169.    By its aforesaid conduct, Watermark and Mr. Gethin have gained an unfair competitive edge by misappropriating the valuable goodwill of Evoqua's trademarks, copyrights, and trade secret information.

170.    Upon information and belief, Watermark and Mr. Gethin have used this

40

competitive edge to sell goods and/or services in competition with Evoqua. Therefore, Watermark and Mr. Gethin are competing unfairly and have competed unfairly with Evoqua under the laws of Michigan.

**COUNT IX – UNJUST ENRICHMENT**
**(Against Gethin and Watermark)**

171.    Evoqua restates and incorporates the above paragraphs of this Complaint as if set forth fully herein.

172.    By its aforesaid conduct, Mr. Gethin and Watermark have received a benefit by avoiding the labor and expense of independently developing a source designating mark and the goodwill associated therewith.

173.    Mr. Gethin and Watermark have also received a benefit by avoiding the time, labor, and expense of independently developing and/or acquiring information that Mr. Gethin and Watermark obtained through misappropriation of Evoqua's trade secret and confidential information.

174.    These benefits come at the expense of Evoqua and it would be inequitable for Mr. Gethin and Watermark to retain the benefits under the circumstances.

175.    Gethin and Watermark have therefore been unjustly enriched by the above-stated facts.

**PRAYER FOR RELIEF**

WHEREFORE, Evoqua requests that this Court grant the following relief, as well as any other relief the Court may deem proper:

a.      Enter judgment in favor of Evoqua and against Defendants on all counts of the Complaint;

20627602.2

b.  Enforce the terms of the 2003 Permanent Injunction against Defendants and compensate Evoqua for its losses incurred through Defendants' breach of the 2003 Permanent Injunction;

c.  Sanction Defendants for contempt of court and violation of the 2003 Permanent Injunction;

d.  Award permanent injunctive relief against Defendants as the Court deems appropriate on all counts;

e.  Award compensatory damages in an amount to be proven at trial;

f.  Award consequential damages in an amount to be proven at trial;

g.  Order an accounting of any and all of Defendants' illicit profits;

h.  Award applicable pre-judgment and post-judgment interest;

i.  Award Evoqua its attorneys' fees and costs of suit; and

j.  Award such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Evoqua demands a trial by jury on all issues so triable.

20627602.2

Dated: January 8, 2016

Respectfully submitted,

Evoqua Water Technologies LLC,

By its Attorneys:

 /s/ J. Michael Huget
J. Michael Huget (P39150)
Kevin M. Blair (P76927)
HONIGMAN MILLER SCHWARTZ AND COHN
LLP
315 E. Eisenhower Parkway, Suite 100
Ann Arbor, MI 48108
Tel: (734) 418-4242
Fax: (734) 418-4243
mhuget@honigman.com
kblair@honigman.com


Craig R. Smith
William J. Seymour
LANDO & ANASTASI, LLP
Riverfront Office Park
One Main Street, 11th Floor
Cambridge, MA 02142
Telephone: (617) 395-7000
Facsimile: (617) 395-7070

20627602.2