UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EVOQUA WATER TECHNOLOGIES LLC,

       Plaintiff,

v.

          File No. 1:16-cv-14

M.W. WATERMARK, LLC, et al.,

          HON. ROBERT HOLMES BELL

       Defendants.

_____/

## O P I N I O N

This is an action to enforce a permanent injunction entered by stipulation of the parties (or their predecessors) and signed by Judge McKeague in 2003, as well as an action for trademark infringement, misappropriation of trade secrets, false advertising, copyright infringement, breach of contract, conversion, unfair competition, and unjust enrichment. Plaintiff Evoqua Water Technologies LLC ("Evoqua") manufactures and sells filter presses, sludge dryers, and other equipment for separating liquids from solids in a process called dewatering. Defendant M.W. Watermark, LLC ("Watermark"), also manufactures and sells dewatering equipment, as well as aftermarket replacement parts for equipment made by Evoqua and other manufacturers. Defendant Michael Gethin is the President and founder of Watermark.[1]

_____

[1]Plaintiff also sues two other employees of Watermark, Daniel Janisse and James Vande Wege, who previously worked for Evoqua/U.S. Filter. They are not the subject of the motion before the Court.

Before the Court is Evoqua's motion for sanctions and/or an order holding Watermark and Gethin in contempt of court because they allegedly violated the permanent injunction. (Mot. for Sanctions, ECF No. 22.)

## I. Procedural History

Plaintiff filed its motion for sanctions in March 2016 and Defendants filed a response. At a hearing in April, the Court determined that discovery and additional briefing were necessary before the motion could be resolved. The parties then conducted discovery. On August 17, Plaintiff and Defendants filed supplements to the motion and response. The Court held another hearing on the motion on September 1, at which the parties presented their respective arguments for or against the motion.

## II. Background

One of Evoqua's predecessors, U.S. Filter/JWI, Inc. ("U.S. Filter"), brought suit against Gethin and his business (then called "J-Parts, LLC") in 2003, alleging trademark infringement, unfair competition, breach of contract, and misappropriation of trade secrets. *See U.S. Filter/JWI, Inc. v. J-Parts, LLC*, No. 5:03-cv-127 (W.D. Mich.) (McKeague, J.). Gethin had been employed by U.S. Filter for a number of years but he left in 2003 to start his own company, which he named J-Parts, LLC. U.S. Filter owned, and Evoqua now owns, the trademarks J-PRESS, J-MATE, and J-VAP for its dewatering equipment. Gethin and his company, J-Parts, LLC, sold parts for U.S. Filter's dewatering equipment. U.S. Filter alleged that Gethin and his company were infringing its marks. Gethin subsequently changed the name of his company to M.W. Watermark, LLC. In December 2003, U.S. Filter, Watermark,

and Gethin settled the lawsuit and stipulated to the entry of a judgment and permanent injunction.

Paragraph 1 of the injunction covers the use of trademarks. Gethin and Watermark are permanently enjoined from using Evoqua's trademarks, including:

> J-PRESS, J-MATE, and J-VAP ("USF/JWI's Trademarks") and colorable imitations thereof . . . in a manner that is likely to cause confusion, mistake or deception with respect to USF/JWI's trademark rights. By way of example, but not limitation, Defendants are ENJOINED from using:
>
> > A. The name "J-Parts" and any other name incorporating the prefix "J-," except pursuant to a fair use thereof, *e.g.*, identifying genuine USF/JWI goods;
> > . . .
> >
> > C. The Internet domain name "www.jpartsllc.com" and any other domain name likely to cause confusion, mistake or deception with respect to USF/JWI's trademark rights, including any domain name incorporating USF/JWI's Trademarks, "J-," J-Parts L.L.C., or "jparts"; by way of example, but not limitation, the injunction provided for herein prohibits Defendants' use of such terms in metatags for any web site that any one or more of them may use in connection with the business of selling spare parts for dewatering equipment.

(Preliminary Injunction ¶ 1, ECF No. 40-1 (emphasis added).)

Paragraph 2 of the injunction covers the use of Evoqua's proprietary information. It provides that Gethin and Watermark are enjoined from "using, disclosing, or disseminating" this information. "Proprietary information" means:

> [Evoqua] information not generally available to the public that relates to the business or activities of, or belongs to, or is controlled or possessed by USF/JWI. The . . . Proprietary Information includes, without limitation, information obtained by Defendants from [Evoqua's] Enterprise Resource Planning ("ERP") System, serial histories, reports, analyses,

> financial information, plans, proposals, processes, sketches, photographs, . . . drawings, specifications, . . . customer lists, supplier and vendor lists, contact lists, and information related to costs, pricing, profits, markets, sales, products, market studies and forecasts, pricing policies and data, customers and customer prospects, . . . agreements with customers, suppliers, vendors, and others, . . . and servicing and training programs and arrangements.

(*Id.* at ¶ 2.)

Plaintiff claims that Defendants have not complied with either of these provisions. Plaintiff seeks a finding of contempt and other sanctions.

### III. Standard

The Court has inherent power to enforce compliance with its orders through its contempt powers. Holding a party in contempt is a matter of discretion, but the movant must produce clear and convincing evidence that the party "violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Elec. Workers Pension Trust Fund of Local Union No. 58, IBEW v. Gary's Elec. Service Co.*, 340 F.3d 373, 379 (6th Cir. 2003). The evidence must be clear and unambiguous, and any ambiguities must be resolved in favor of the party charged with contempt. *M&C Corp. v. Erwin Behr GmbH & Co.*, 298 F. App'x 927, 935-36 (6th Cir. 2008). Because a civil contempt proceeding is remedial in nature, the moving party does not need to demonstrate willfulness; the intent of the party disobeying the court's order is irrelevant. *In re Jacques*, 761 F.2d 302, 306 (6th Cir. 1985).

Once the movant establishes his *prima facie* case, the burden shifts to the contemnor who may defend by coming forward with evidence showing that he is *presently* unable to

comply with the court's order. *United States v. Rylande*r, 460 U.S. 752, 757 (1983).

## IV. Defendants' Conduct

At his deposition, Gethin stated that he tried to move on with his business after receiving a copy of the injunction order. He does not recall looking at the order again; he believes that he "shoved it in a drawer somewhere." (Gethin Dep. 54, ECF No. 43-1.) At the time, Gethin was the only employee of Watermark, and he believed that all issues regarding the use of Plaintiff's proprietary information and trademarks had been taken care of, so he did not create or implement any policies to ensure future compliance with the injunction.

Later, as Gethin began to hire additional employees, he did not tell them about the injunction. He believed that the injunction was confidential because it was attached as an exhibit to a confidential settlement agreement. The settlement agreement, however, expressly states that it can be discussed with employees. (Settlement Agreement ¶ 6, ECF No. 1-8.) Moreover, the permanent injunction is part of the public record.

Because Gethin did not discuss the injunction with his employees or create any policies to ensure compliance, a number of new employees who had worked for Evoqua (or its predecessors) brought with them information regarding Evoqua's customers, sales, pricing, and products. This information was potentially useful to Watermark because Watermark is a direct competitor of Evoqua. Both sell the same sort of equipment (e.g., sludge dryers and filter presses). In addition, both sell replacement parts for machines sold by Evoqua (and its predecessors).

### A. Proprietary Information

Paragraph 1 of the injunction prohibits Gethin and Watermark from using, disclosing or disseminating Plaintiff's proprietary information, a term that is defined to include: information from Plaintiff's Enterprise Resource Planning system, serial histories, customer lists, and other information not generally available to the public regarding Plaintiff's pricing, sales, and products. During discovery, the parties discovered the following information in Watermark's possession:

### 1. Serial Log Files

Several "serial log files"[2] from Evoqua's ERP System were found in Watermark's possession. (ECF Nos. 40-9, 40-10.) These files contain several hundred pages of information about equipment sold by Evoqua's predecessors from around 1980 to as recent as 2000, including the serial number, model number, date shipped, customer name, and customer contact. This information could be used by Watermark determine which parts to sell to customers with Evoqua equipment. (Driesenga Dep. 46-47, ECF No. 40-6.)

One such file was generated by a former Evoqua employee, Dave Higgins, who left Evoqua in 2011 and is now at Watermark. It was accessed as recently as April 3, 2015, by Jim Driesenga, another former Evoqua employee who is now at Watermark. Driesenga obtained it from someone in Watermark's aftermarket sales department. (*Id.* at 52.)

---

[2]Watermark employee Jim Driesenga testified that a "serial log" file is different from, and less detailed than, a "serial history" file. A serial log contains information about equipment sold by Evoqua. A "serial history" would also include information about every spare part sold by Evoqua.

Driesenga used it to determine the age of used Evoqua machines that were being sold at auction. (*Id.* at 50-51, 58.)

Another serial log file was found in the possession of Watermark's project manager, Andrew Hagen, a former Evoqua employee. Hagen apparently received it from Watermark aftermarket salesperson Jeff Miller, another former Evoqua employee. In October 2012, Miller emailed it to Hagen along with a model number and sales order number to determine which operation and maintenance ("O&M") manual should be sent to a customer with a refurbished Evoqua/JWI filter press. (Email, ECF No. 40-12.)

2. Customer contact list

The injunction also prohibits the use and dissemination of Evoqua's customer lists and contact lists. Around the time that he left Siemens (another Evoqua predecessor) in 2012, Driesenga emailed himself a spreadsheet listing 118 customers. The list includes details about the Evoqua equipment that they purchased (including model and serial number), and their phone and email contact information. (ECF No. 40-13.) Driesenga acknowledged that the list would be helpful to assess which replacement parts were needed for his customers. (Driesenga Dep. 47.) However, he contends that he rarely used the contact list except as a reference to remember when and whether he had worked with a customer. He did not use it to contact customers or to persuade them to change vendors from Siemens/Evoqua to Watermark.

3. <u>O&M Manuals</u>

The injunction also prohibits the use and dissemination of information not generally available to the public about Evoqua's products, including drawings and sketches. According to Gethin, Watermark maintains a "library" of operation and maintenance ("O&M") manuals for Evoqua products. (Gethin Dep. 165.) Watermark sent copies of these manuals to its customers with Evoqua/JWI equipment, either at the customer's request or in connection with the sale of refurbished equipment (*id.* at 165) or with an order for replacement parts (*see* Driesenga Dep. 91-92; 1/28/2010 Email, ECF No. 43-15). Before sending these manuals to its customers, Watermark changed the contact information in the manual from Evoqua/JWI's information to Watermark's contact information. (Gethin Dep. 166.)

In addition, the original manuals contain a notice stating that they are the "proprietary information" of JWI, for "customer and internal use only." (ECF No. 43-25, PageID.3504.) Watermark changed this notice to state that the manuals are the proprietary information of Watermark. (Gethin Dep. 198-200.) The parties dispute whether these manuals are generally available to the public. Plaintiff distributed these manuals to customers when selling equipment. (Bosgraaf Dep. 66, ECF No. 43-7.) Watermark obtains copies of the manuals when purchasing used equipment. (Gethin Aff. ¶ 21, ECF No. 29-1.)

4. <u>Engineering Manuals</u>

Watermark also possessed several of Evoqua's engineering manuals, which contain details about the construction and operation of Evoqua's equipment, as well as information about the original pricing for various parts. Watermark's Senior Sales Engineer, Paul Malik,

a former employee of Siemens, kept copies of these manuals when he left, including a J-Press manual and a J-Mate manual. He used them "off and on" while at Watermark to obtain "technical information." (Malik Dep. 70, ECF No. 43-3.) In addition, in 2014, when Watermark was deciding what options to offer for its DryMate sludge dryer, Malik disseminated a list of options from the engineering manual for the J-Mate dryer. (*See* Email, ECF No. 43-33.) The list contained the prices for these options as of 2009. (*Id.* at PageID.4129.)

     5. Price Lists

     The injunction prohibits the use of Evoqua's pricing information not generally available to the public. Gethin asserts that Watermark regularly collects Evoqua's spare parts price lists in order to set lower prices for Watermark's replacements parts. (*See* J-Mate Dryer Spare Parts List (October 2006) (comparing Evoqua prices to Watermark prices), ECF No. 43-32.) It is not clear where this information was obtained or whether it is generally available to the public.

     6. Supplier Information

     The injunction prohibits the use and dissemination of Evoqua's supplier lists. In April 2015, Watermark employee Dan Janisse sent an email to an Evoqua employee, asking, "who were the primary FRP [tank] Suppliers that Evoqua is currently engaged with?" (Email, ECF No. 9-3, PageID.582.) When asking this question, Janisse included a list of suppliers, stating, "If my memory doesn't fail me, do these suppliers ring a bell[?]" (*Id.*) The Evoqua employee

replied, "Your list is our primary sources." Janisse subsequently contacted one of the suppliers on the list to obtain a price quote.

Defendants note that no supplier list was exchanged or otherwise disseminated in this e-mail correspondence. Janisse apparently confirmed that the information from his memory was correct. Moreover, Watemark notes that it did not actually use this information except to obtain a price quote from one of the suppliers. Watermark did not purchase anything from this supplier.

7. Training Materials

The injunction prohibits the use of its "sketches" and "training programs" not generally available to the public. In August 2015, Watermark circulated a marketing email containing a sketch similar to one created by Evoqua. In addition, Malik created a presentation about filter presses (*see* ECF No. 43-36) using several of the diagrams from a presentation created by an Robert Bosgraaf at Evoqua (*see* ECF No. 43-35). Watermark's presentation was used for training new employees. (Malik Dep. 27-28, ECF No. 43-3.)

Defendants contend that there was no confidential information in Watermark's presentation. Bosgraaf testified that there is no secret to how filter presses work (they have been the same for 200 years), and that the information in his slide is not confidential. (Bosgraaf Dep. 173, 176, ECF No. 39-10.)

### B. Trademarks

#### 1. J-Mate

The injunction prohibits Gethin and Watermark from using "J-Mate" in a manner likely to cause confusion, mistake or deception, except pursuant to a fair use. Watermark used this term in various places on its website:

- A page titled "J-Mate Archives - M.W. Watermark" linked to an article about the DryMate sludge dryer, titled "Is it Time to Replace your Sludge Dryer?" (ECF No. 22-6.)

- An article about the DryMate sludge dryer contained a list of "tagged" terms at the bottom, including "J-Mate" and "JMate." (*Id.* at PageID.843.))

- A blog post titled "J-Mate® Versus DryMate™ Continuous Sludge Dryer: A Side by Side Comparison" touted DryMate as a "direct replacement for" and "improvement" over J-Mate. (ECF No. 40-41.)

None of these pages clarified that J-Mate products are manufactured and sold by a different entity.

#### 2. DryMate

The injunction prohibits the use of "colorable imitations" of J-Mate in a manner likely to confuse. Defendant sold a sludge dryer very similar to the Evoqua sludge dryer, called

DryMate.[3]

# V. Application

## A. Proprietary Information

Defendants correctly assert that mere possession of proprietary information is not sufficient to find a violation of the injunction. There must be evidence that Defendants used, disclosed, or disseminated information that is not generally available to the public.

### 1. Serial Log Files

The clearest example of a violation of Paragraph 2 of the injunction is Watermark's use and dissemination of Plaintiff's serial log files. It is clear that the information in these files is proprietary information as defined by the permanent injunction. Although Defendants contend that these files are not "serial history" files, which are specifically mentioned in the injunction, the injunction also proscribes the use of information from Plaintiff's ERP system, including information about Plaintiff's sales. Indeed, Defendants concede that Watermark should not have possessed this information. (Defs.' Suppl. Br. at 11, ECF No. 35.)

It is also clear that Watermark used this information (*see id.* at 12 (noting that Driesenga "referenced the information to ascertain the age of a piece of used machinery that was being auctioned for sale") and disseminated it among Watermark's employees (*see* Email, ECF No. 40-12). These files were not discovered until July 2016, after the parties engaged in discovery. (Def.'s Suppl. Br. at 10.)

---

[3]Defendant recently changed the name of its sludge dryer to "M.W. Watermark Continuous Sludge Dryer."

### 2. Customer Contact List

Another example of a violation of Paragraph 2 is Driesenga's use of a customer contact list that he brought with him from Siemens. The injunction expressly prohibits the use of customer lists, and Defendants acknowledge that Watermark should not have possessed this information. (*Id.* at 6.) It is also clear that Driesenga actually used this list while he was at Watermark (*id.* at 8), though it appears that his use was somewhat limited. Like the serial log files, the contact list was not discovered until after the motion for sanctions was filed. (*Id.* at 10.)

### 3. Other Information

As for the equipment manuals, price lists, supplier list, and training presentation materials, it is less clear that this information is covered by the injunction or was used or disseminated by Defendants. There is conflicting evidence about whether the equipment manuals are generally available to the public. Plaintiff offers no evidence to demonstrate that its pricing is not generally available to the public. The alleged supplier list appears to have come from the memory of a Watermark employee, created by that employee while at Watermark. Thus, it is not a list that belongs to Plaintiff. Finally, the slides in the training presentation do not contain confidential information.

## B. Trademarks

### 1. J-Mate

Paragraph 1 of the injunction prohibits the use of marks beginning with "J-," except pursuant to a fair use. Watermark argues that its use of the term "J-Mate" is a fair use. The blog article described Plaintiff's product, which is *arguably* a fair use, but that is certainly not how J-Mate was used every instance.

Some of the pages used J-Mate in the title or in keyword tags without mentioning J-Mate products. The only plausible reason for including J-Mate in these pages was to attract customers looking for information or products associated with J-Mate to Defendant's website. Indeed, Watermark's employees were aware that this could happen. One of them expressed concern about using "J-Mate" so many times in the blog article, asking, "Do we want to mention the J-Mate that much? We might want to stress our positive improvements over 'existing dryer designs' rather than describing the shortcomings of the J-Mate in that much detail?" (Email, ECF No. 43-38.) The author of the blog article responded, "[I]f nothing else, it well help drive search traffic to our blog and website, as the article is loaded with relevant keywords." (*Id.*) Another person commented, "I just don't like putting the competition[']s product name out there that can enable a customer to look at them too if sourcing for a new dryer application." (*Id.*) Another employee suggested, "Can we set J-Mate as a meta tag or whatever they are called without using J-Mate in the body of the blog posting?" (*Id.*)

Using the term J-Mate in keyword tags or in the title of web pages advertising Watermark's sludge dryer is not a fair use, and is likely to confuse. At the very least, it leads to "initial-interest confusion," which occurs when a user interested in a particular brand of product searches for that product in a search engine and is led to a competitor's page promoting a different product. *See Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 549 (6th Cir. 2005) (discussing initial-interest confusion).

Defendants' website was the fourth or fifth search result when using Google to search for "J-Mate." After finding Watermark's website, a customer reading the site could readily believe Watermark sold genuine J-Mate parts or products, or that DryMate was an improved version of the J-Mate dryer, made by the same entity. This belief would have been reinforced by the blog post touting DryMate as a "direct replacement" for the J-Mate dryer.

Consequently, the Court finds that Defendants violated the clear terms of the injunction by using J-Mate on Watermark's website.

### 2. DryMate

The injunction also prohibits the use of colorable imitations of Plaintiff's marks. As indicated, Defendants advertised the "DryMate" sludge dryer as a direct replacement for Plaintiff's J-Mate sludge dryer. Whether or not Defendants' use of "DryMate" violated the injunction presents a more complex question than the use of J-Mate. Unlike J-Mate, the term DryMate is not expressly identified as a prohibited mark in the injunction. The Court must determine whether DryMate is a "colorable imitation" of Plaintiff's trademarks and whether it was used in a manner that is "likely to cause confusion." (Permanent Injunction, ECF No. 40-1.)

Plaintiff argues that the issue can be resolved in a straightforward manner under the "safe distance rule." The Sixth Circuit generally applies the "safe distance rule" when enforcing injunctions. *See Innovation Ventures, LLC v. N2GDistributing, Inc.*, 763 F.3d 524, 544-45 (6th Cir. 2014). The rule requires the defendant to keep a "safe distance" away from the dividing line between violation of and compliance with the injunction. *Sunbeam Prods. v. The West Bend Co.*, 123 F.3d 246, 260 (5th Cir. 1997); *Broderick & Bascom Rope Co. v. Manoff*, 41 F.2d 353, 354 (6th Cir. 1930). It "'prevent[s] known infringers from using trademarks whose use by non-infringers would not necessarily be actionable.'" *Innovation Ventures,* 763 F.3d at 544 (quoting *Taubman Co. v. Webfeats*, 319 F.3d 770, 778-79 (6th Cir. 2003)).

In contempt proceedings, the rule "'reliev[es] the reviewing court of the need to retry the entire range of issues that may be relevant in an infringement action for each small variation the defendant makes to the enjoined mark.'" *Id.* (quoting *PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d 109, 118 (2d Cir. 2008)). Where the rule applies, the Court is not required to examine every issue that may be relevant in an infringement action. The Court need not "go through a full likelihood-of-confusion analysis" to determine whether a product or mark is confusingly similar to another. *Id.* at 545.

In this case, the safe distance rule does not apply because Defendants are not "known infringers." They entered into the injunction by agreement with Plaintiff, without a finding or acknowledgment of infringement. *See Taubman Co v. Webfeats*, 318 F.3d 770, 779-80

- 16 -

(6th Cir. 2003) ("[T]he Safe Distance Rule was meant to be applied only against proven infringers."); *see also Plough, Inc. v. Kreis Labs.*, 314 F.2d 635, 639 (9th Cir. 1963) (safe distance rule does not apply to enforcement of consent decree entered with no acknowledgment of infringement); *accord Prince of Peace Enters., Inc. v. Kwok Shing Import-Export, Inc.*, No. C 94-04183 CW, 1997 WL 475699, at *5 (N.D. Cal. July 8, 1997).

On the other hand, the Sixth Circuit has made clear that the "safe distance" rule is an extension of the Court's equitable power to craft and enforce an injunction. *See Innovation Ventures,* 763 F.3d at 543. In other words, an injunction can be broader than what the law requires, and the Court can make a contempt finding even if the conduct at issue would not be actionable as trademark infringement. Thus, the issue is not necessarily whether Defendants' use of DryMate actually infringed Plaintiff's trademark rights, but whether that use violated the clear and definite terms of the injunction. *See Plough*, 314 F.2d at  639 ("Appellees . . . either violated the injunction, or they did not.").

In this case, the terms of the injunction require a likelihood-of-confusion analysis, similar to what would be required for a trademark-infringement claim. The injunction not only refers to use that is "likely to cause confusion," it also employs the term "colorable imitation," which is defined in the Lanham Act as a "mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive." 15 U.S.C. § 1127. Thus, a likelihood-of-confusion analysis is necessary to determine whether the use of DryMate was improper.

- 17 -

The Court finds it unnecessary to undertake this analysis at this stage, however. The Court has already determined that Defendants violated the injunction by using and disseminating Plaintiff's proprietary information and by using the term J-Mate. These findings are sufficient to warrant contempt sanctions. Moreover, as explained in more detail below, the appropriate sanction in this case is to award Plaintiff its reasonable attorney's fees and costs for bringing the lawsuit and the motion for sanctions. No additional sanctions will imposed by the Court at this time. Consequently, it is unnecessary for the Court to determine whether Defendants also violated the injunction by using DryMate.[4]

In short, the Courts finds that, at the very least, Defendants violated the permanent injunction by (1) using and/or disseminating the serial log files and the contact list, and (2) using the term J-Mate on their website. There is no evidence that Defendants are presently unable to comply with the terms of the injunction.

## VI. Relief

Having determined that Plaintiffs have established by clear and convincing evidence that Defendants violated the clear and definite terms of the injunction, the Court must determine the appropriate sanction. "With respect to civil contempt proceedings, '[j]udicial sanctions . . . may, in a proper case, be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.'" *Gary's Elec.*, 340 F.3d at 379 (quoting *United States v. United Mine*

---

[4]Plaintiff is, of course, free to pursue its claim of trademark infringement on this issue, and to recover any damages to which it may be entitled if it is successful.

*Workers of Am.*, 330 U.S. 258, 303-04 (1947)). "[T]he objective of any contempt determination is to enforce the message that court orders and judgments are to be taken seriously." *Id.* at 385.

As relief, Plaintiff requests: (1) a contempt finding; (2) disgorgement of Defendants' profits on sales of all aftermarket parts, supplies and services to Evoqua's customers since 2012; (3) disgorgement of Defendants' profits on sales of the DryMate sludge dryers; (4) Plaintiff's costs and attorney's fees for bringing the action and the motion for sanctions; (5) a four-year injunction preventing Watermark from selling services and parts for Evoqua equipment; and/or (6) sanctions in the amount of $1,000 per day until Watermark submits to e-discovery by an expert of Plaintiff's choosing (at Defendants' expense) to provide a schedule of all Evoqua materials in Defendants' possession and to certify that such materials have been removed.

The Court will find Defendants in contempt and award Plaintiff its reasonable attorney's fees and costs for bringing the action and the motion for contempt. The Court notes that Defendants made no effort to comply with the injunction until concerns were raised by Plaintiff in July 2015. Defendants assert that they have taken significant remedial efforts since that time. They claim to have purged all of Plaintiff's proprietary information. In addition, Watermark's website no longer uses the term "J-Mate" and its sludge dryer is no longer called "DryMate." However, these remedial efforts do not change the fact that

Defendants did not heed the terms of an order entered by this Court, and that a lawsuit and motion for sanctions were necessary to secure Defendants' compliance.

After Plaintiff first notified Defendants of some of its concerns in July 2015, Gethin represented that he spoke with all of his employees who had worked for Evoqua and "was assured" that they had not retained any "proprietary information related to Evoqua equipment." (8/14/2015 Email, ECF No. 29-1, PageID.896.) He also represented that Watermark did not have any of Evoqua's "internal documents." (*Id.*) Gethin may not have been aware of it at the time, but this representation was not accurate. It was not until after Evoqua filed its lawsuit and motion for sanctions that Defendants conducted a thorough review of their files and then disclosed the serial logs, the contact list, and other documents. Similarly, Watermark did not remove the term J-Mate from its website until after the motion for contempt was filed. Plaintiff should be compensated for the legal actions that it took to obtain compliance with the clear terms of the injunction.

The Court declines to require disgorgement of Defendants' profits, however, because there is very little evidence that Plaintiff's non-public information was used in any significant manner for Defendants' benefit and to the detriment of Plaintiff. There is also no evidence of actual customer confusion from Defendants' use of the terms J-Mate and DryMate, and/or harm to Plaintiff therefrom. Indeed, there is some evidence that Plaintiff was making significant changes to its business during the relevant time period. In 2014, Plaintiff communicated to its sales representatives that it had decided to "exit" the J-Mate product

line. (*See* Letter, ECF No. 39-13.)[5] It did not sell any J-Mate dryers in 2014 and 2015 (though it continued to sell replacement parts). (*See* Evoqua J-Mate Dryer Bookings, ECF No. 43-40.) In these circumstances, it is highly unlikely that *all* of Defendants' profits related to sales of the DryMate dryer and J-Mate replacement parts since 2012 would have accrued to Plaintiff if not for Defendants' conduct.

Finally, the Court declines to award prospective injunctive relief in the form of e-discovery and certification requirements because the parties have already engaged in significant discovery and Defendants turned over a significant quantity of material that they acknowledge they should not have possessed. Defendants continue to be bound by their discovery obligations under the Federal Rules, and the Court assumes that they will comply. Similarly, the Court declines to issue a prospective injunction enjoining future sales of parts and services for Evoqua equipment because Defendants continue to be bound by the broad terms of the permanent injunction, which the Court maintains jurisdiction to enforce.

An order will enter that is consistent with this Opinion.


Dated: September 12, 2016                   /s/ Robert Holmes Bell
                                             ROBERT HOLMES BELL
                                             UNITED STATES DISTRICT JUDGE

---

[5]Plaintiff asserts that it decided to sell the J-Mate dryer as a custom-order product instead of an off-the-shelf product, but that it reversed course in 2016.