UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

EVOQUA WATER TECHNOLOGIES LLC,

        Plaintiff,

v.

M.W. WATERMARK, LLC et al.,

        Defendants.
_____/

Case No. 1:16-cv-14

Honorable Robert J. Jonker

## OPINION

Defendants Michael Gethin and M.W. Watermark, LLC have filed a motion for summary judgment (ECF No. 158) as to Counts II (trademark infringement), IV (false advertising), and V (copyright infringement) of the First Amended Complaint. On January 11, 2018, the Court denied the motion as to Counts II and IV, and took the motion under advisement as to Count V. The Court permitted the parties to provide further briefing regarding Evoqua's claim of ownership in the copyrights at issue. The parties have done so. After review of the briefs, the Court finds that Defendants are entitled to summary judgment on Count V.

### I. Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); Fed. R. Civ. P. 56(c). An issue of fact is "genuine" if a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 284. In considering a motion for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The ultimate question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Jones v. Potter*, 488 F.3d 397 (6th Cir. 2007).

## II. Background

Evoqua and Watermark are competitors in the de-watering business. In October 2015 and May 2016, Evoqua obtained copyright registrations for the following works:

- a presentation entitled "How Does a Filter Press Work?" (created in 2006);
- a presentation entitled "Filter Presses" (created in 2001);
- a sales brochure entitled "J-Press Liquids-Solids Filtration Equipment and Separation Equipment (created in 1985);
- a manual entitled "J-Press Filter Press 1200 MM Owner's Manual" (created in 1989);
- a manual entitled "J-Press Filter Press 630 MM Owner's Manual" (created in 1994);
- a drawing entitled "Automatic Pump Control System Cabinet Assembly" (created in 1994); and
- a drawing entitled "Automatic Pump Control System with Air Blowdown" (created in 1989).

In Count V of its amended complaint, Evoqua contends that Watermark has infringed Evoqua's rights in these works. "The first element of a copyright-infringement claim is 'ownership of a valid copyright.'" *Star Athletica, LLC v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1008 (2017) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). As the plaintiff claiming copyright infringement, Evoqua has the burden of proving ownership. *Hi-Tech Video Prods., Inc. v. Capital Cities/ABC, Inc.*, 58 F.3d 1093, 1095 (6th Cir. 1995). The Court concludes that Evoqua cannot, as a matter of law, establish actual ownership of the copyrights on this record.

Ownership of a copyright "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). Evoqua could not have been the author of the foregoing works because it did not exist until 2013, long after the works were created. Accordingly, Evoqua must stake its claim on

having properly acquired ownership from the original authors through any intervening entities. For purposes of summary judgment, the Court will assume that the original human authors properly assigned the work to the entity for which they worked at the time of creation. The controlling question is then whether a reasonable jury could find that Evoqua has an unbroken chain of ownership through the series of transactions leading from the original owner to the creation of Evoqua in 2013.

The chain of transactions begins with JWI, Inc. In 1997, U.S. Filter Wastewater Group, Inc. acquired the stock of JWI, Inc. and certain assets from its owners. (*See* Acquisition Agreement, ECF No. 172-1.) JWI, Inc. subsequently changed its name to U.S. Filter/JWI, Inc. In 2006, U.S. Filter/JWI, Inc. merged into Siemens Water Technology Corporation, which merged into Siemens Water Technology Holding Corporation, which later merged into Siemens Industry, Inc. In 2013, Siemens Industry, Inc. split itself into pieces. It assigned certain assets of its water-technologies business division to a new entity named Siemens Water Technologies LLC, which later changed its name to Evoqua Water Technologies LLC (the plaintiff in this action).

Watermark has identified several potentially defective links in the chain of ownership of the copyrights, including: (1) the link from the human authors of the works to the entity in existence at the time of authorship; (2) the link from JWI to U.S. Filter; and (3) the link from Siemens Industry to Siemens Water Technologies. Watermark also suggests that there may be other defective links that it has not been able to explore because Evoqua has objected to disclosure of the transactions by which it obtained ownership of the assets of JWI, Inc. (*See* Evoqua Resp. to Interrog. No. 16, ECF No. 169-2.) A defect in any one of these links poses a potential problem for Evoqua. The Court will address only the link in 2013 from Siemens Industry to Siemens Water Technologies, because the break in that link is fatal to Evoqua's claim.

3

**III.    Analysis**

The document memorializing the transfer of certain assets from Siemens Industry to Siemens Water Technologies is the Carve-Out Agreement.  (Carve-Out Agreement, *U.S. Filter/JWI, Inc. v. J-Parts, LLC*, No. 5:03-cv-127, ECF No. 48-1.)  Section 1.1 of this agreement contains a broad assignment of "all of Seller's right, title and/or interest" in all assets "exclusively pertaining to the [water-technologies business]." (*Id.*, PageID.779.)  This section does not transfer any intellectual property rights, however.  It expressly excludes "IP . . . , trademarks and their applications, domains and any other intellectual property rights[.]" (*Id.*)

The disposition of intellectual property is reserved for Section 2.  (*See* Carve-Out Agreement, Section 2.10.4, PageID.793 (stating that "the transfer of, and grant of rights under, IP shall occur exclusively on the basis of this Section 2").)  Sections 2.1 through 2.4 assign different categories of intellectual property assets.  "Patents and Trademarks" are covered in Section 2.1, "Know-how" in Section 2.2, "Software" in Section 2.3, and "Domains" in Section 2.4.  (*Id.*, PageID.782-784.)  There is no section devoted expressly to copyrights, and nothing in any portion of Section 2 that affirmatively and expressly transfers copyrights or copyrightable works by name.

Evoqua contends that the copyrights at issue are covered by more generic language in Section 2.2, which provides, in relevant part:

> Sale and Assignment of Know-how. . . . Seller hereby sells and assigns to Purchaser *all information and data (irrespective as to whether such information and data is available by way of documentation, orally or in electronic format and irrespective as to whether they are protected by copyrights or not)*, including business and trade secrets, technical and business information and data, inventions, experience and expertise, all to the extent that such information and data are not Software (as defined in Section 2.3 below) and/or not a Patent (collectively herein "**Know-how**") which (i) is exclusively used by the Business in the Business Field on the Effective Date, and (ii) which Seller has the exclusive authority to dispose of on the Effective Date (herein "**Transferred Know-how**"). . . . The Parties agree that the documentation in which the Transferred Know-how is embodied is already available in the Business and a separate handover of such documentation is

> therefore not necessary. Should Purchaser within twenty-four (24) months after the Effective Date and on a case-by-case basis nevertheless need a copy of a part of the Transferred Know-how for the operation of the Business, Seller shall, upon written request of Purchaser, provide Purchaser with such copy to the extent available at Seller.

(*Id.*, PageID.783-784 (italics added).) In other words, Evoqua contends that when Siemens Industry assigned all "information and data" exclusively used by its water-technologies business, it was assigning the copyrights in the product manuals, drawings, and presentations allegedly infringed by Watermark. The Court disagrees, for several reasons.

*First*, the phrase "information and data" is an odd container for copyrights, because information and data, standing alone, are generally considered to be outside the scope of copyright protection. *See Feist Publ'ns*, 499 U.S. at 344 ("[F]acts are not copyrightable[.]"); 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."). It is only the specific manner in which information or data is expressed or arranged in an original work that is copyrightable. *See id*. at 348 ("[A] directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement."); *see also Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 703 (2d Cir. 1992) ("It is a fundamental principle of copyright law that a copyright does not protect an idea, but only the expression of the idea."); 17 U.S.C. § 102(a) (defining copyrightable subject matter as "original works of authorship *fixed in any tangible medium of expression*" (emphasis added)).

*Second*, there is a difference between assigning information and data and assigning ownership in the work embodying that information and data. Assigning one does not necessarily

5

imply an assignment of the other. This distinction between "information and data" and the (potentially copyrightable) work in which that information/data is fixed is apparent in the Carve-Out Agreement itself. Section 2.2 refers to "documentation" in which the "know how" assigned by Siemens Industry is "embodied." (Carve-Out Agreement, PageID.784.) Tellingly, the agreement assigns only the information and data. It does not assign ownership in the documentation itself. The parties clearly intended for a copy of this documentation to be "available" to Siemens Water Technologies, but granting a right to *use* the documentation (in effect, a license) for the purpose of accessing the information and data is not equivalent to transferring ownership in the documentation.

*Third*, as every patron of a bookstore knows, transferring ownership of a copy of a work is not equivalent to transferring ownership in the copyright to that work. Thus, even if the agreement could be construed to transfer ownership in the documentation and other works embodying the information and data, there is no indication that the parties intended to transfer the copyright in those works. Copyright is the author's (or assignee's) power to prevent others from reproducing the work. The "information and data" transfer provision does not even hint at this. It is devoted exclusively to ensuring that Siemens Water Technology can itself make use of information and data, as well as any embodied versions of it.

*Fourth*, the clause specifying that the information and data are assigned "irrespective as to whether they are protected by copyrights or not" further indicates that copyrights are not the object of the assignment. In other words, the information and data being transferred may or may not be protected by copyright but it is the information and data that are assigned, not the copyright itself. To read this section the way Evoqua contends would convert a clarifying phrase into an affirmative grant of additional rights.

6

*Fifth*, the types of property expressly identified in Section 2.2 as examples of what is being transferred by that section are different from copyrights. Section 2.2 purports to transfer "know-how," and it gives the following examples of what this includes: "business and trade secrets, technical and business information and data, inventions, experience and expertise." Know-how, trade secrets, inventions, experience, and expertise may each be a form of intangible property, but they are not copyrights.

*Sixth*, the scope of the language of assignment in Section 2.2 is more narrow than what can be found elsewhere in the agreement. Section 1 assigns "all right, title, and interest" in certain assets, whereas Section 2.2 merely "assigns" the information and data constituting know-how. This case might be a closer call if the agreement assigned "all right, title, and interest" in the information and data. One could argue, perhaps, that "all, right, title, and interest" in information and data would include any copyrights protecting that information and data. But the drafters of the agreement chose not use such broad language in Section 2.2. The Court assumes that this choice was intentional.

The narrow language of assignment in Section 2.2 is consistent with Section 1.1.4, which transfers all right, title, and interest in "Seller's books and records, files and other documents and data (including written and electronic training materials utilized to train the employees of the Business . . . )[.]" (*Id.*, PageID.780.) Section 1.1.4 might have been a natural place to transfer the copyrights in the manuals and presentations created by earlier entities, but the agreement carefully avoids doing so. Section 1.1.4 expressly excludes documents and data "constituting, containing, or relating to Patents, Know-How, Software, trademarks and their applications, domains *and any other intellectual property rights*[.]" (*Id.* (emphasis added).) Accordingly, when transferring the

7

sort of materials that Evoqua now seeks to protect, Siemens Industry chose not to transfer any copyrights in those materials.

*Seventh*, the agreement contains a separate provision transferring a potentially copyrightable work. Section 2.3 assigns software to Siemens Water Technologies. If, as one of Evoqua's employees contends in his affidavit, "Section 2.2 was intended to convey all rights in copyrightable and non-copyrightable works to Siemens Water Technologies, LLC" (Wilderer Decl., ECF No. 162-8, PageID.7286), then there would have been no need for Section 2.3. The existence of Section 2.3 confirms that the parties did not intend for Section 2.2 to cover copyrights.

In short, the Carve-Out Agreement transfers several different categories of intellectual property to the new entity (now Evoqua) created in 2013. With the possible exception of the software described in Section 2.3, copyright is not one of them. There are a number of plausible explanations for why the parties might have agreed to this arrangement. Perhaps they did not deem any copyrightable works (other than the software) to be significant for the business. Or perhaps Siemens Industry was not confident that it owned the copyrights to the product manuals and other works created for its predecessors.[1] But whatever the reason, Siemens Industry's failure to assign those rights in the Carve-Out Agreement defeats Evoqua's claim of copyright infringement.

Evoqua attempts to avoid this result in several ways, none of which are effective. First, it offers the affidavits of its own employees, and of an employee of Siemens Industry, who assert that Section 2.2 of the Carve-Out Agreement intended to convey all rights in copyrightable works to Siemens Water Technologies. (Wilderer Decl., ECF No. 162-8; Ganzi Decl., ECF No.

---

[1] In its briefing, Watermark raises legitimate questions about whether Siemens Industry's predecessors authored the works or obtained the copyrights from those who did.

170-2; Wallace Decl., ECF No. 170-1.) The Court cannot consider these affidavits, however, unless it finds that the language of the Carve-Out Agreement is ambiguous.

The Carve-Out Agreement contains a choice-of-law provision stating that the agreement is to be "governed by, and construed in accordance with, the laws of Delaware[.]" (Carve Out Agreement, Section 17.) When interpreting a contract, Delaware courts adhere to the familiar parol evidence rule, which "give[s] priority to the parties' intentions as reflected in the four corners of the agreement." *GMG Capital Investments, LLC v. Athenian Venture Partners I, LP*, 36 A.3d 776, 779 (Del. 2012). "The Court will interpret clear and unambiguous terms according to their ordinary meaning." *Id.* at 780. "Where a contract is ambiguous, 'the interpreting court must look beyond the language of the contract to ascertain the parties' intentions.'" *Id.* (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)). "[A]n ambiguity exists '[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.'" *Id.* (quoting *Eagle Indus.*, 702 A.2d at 1232).

"The question of whether the language of an agreement is ambiguous is a question of law." *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003). "If a contract contains ambiguities, it generally becomes the task of the fact-finder to use extrinsic evidence to determine the intent of the parties." *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 422 (6th Cir. 2008); *see also GMG Capital Investments*, 36 A.3d at 783. ("[W]here reasonable minds could differ as to the contract's meaning, a factual dispute results and the fact-finder must consider admissible extrinsic evidence."). In this case, the Court discerns no ambiguity in the four corners of the Carve-Out Agreement as it pertains to the assignment of copyrights. Thus, the self-serving affidavits offered by Evoqua are irrelevant.

9

Next, Evoqua contends that Watermark cannot raise ownership as a defense to copyright infringement, citing *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27 (2d Cir. 1982), *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 186 F. Supp. 2d 1 (D. Mass. 2002), and similar cases. According to the court in *John G. Danielson*, "when an author and a transferee do not dispute the ownership of a copyright interest, a third party may not raise the issue of copyright ownership as a defense to a claim that it infringed the copyright." 186 F. Supp. 2d at 12. Similarly, in *Eden Toys*, the Second Circuit noted that in cases "in which the copyright holder appears to have no dispute with its licensee [over ownership of the copyright interest], it would be anomalous to permit a third party infringer to invoke [17 U.S.C. § 204(a)] against the licensee." *Eden Toys*, 697 F.2d at 36. Evoqua contends that, because there is no dispute between Siemens Industry and Evoqua as to who owns the copyrights at issue, Watermark should not be able to use the terms of the agreement between them to contest Evoqua's ownership of those copyrights.

The principle in *Eden Toys* does not apply here. In that case, the court focused on the statute of frauds in 17 U.S.C. § 204(a), which requires that transfers of interests in copyrights be made in writing. The defendant apparently claimed that the plaintiff did not have the right to sue for infringement because the plaintiff had obtained its interests via an informal arrangement. *Eden Toys*, 697 F.2d at 36. The court opined that a third-party infringer should not be able to use § 204(a) to challenge an informal assignment of rights, where that assignment was later confirmed by the parties in writing. According to the court:

> the purpose of [section 204(a)] is to protect copyright holders from persons mistakenly or fraudulently claiming oral licensees, the "note or memorandum of the transfer" need not be made at the time when the license is initiated; the requirement is satisfied by the copyright owner's later execution of a writing which confirms the agreement.

*Eden Toys*, 697 F.2d at 36.

10

Unlike the defendant in *Eden Toys*, Watermark is not attempting to enforce the "writing" requirement of section 204(a). Watermark does not claim that Evoqua or its predecessors failed to put the copyright assignment in writing. Instead, Watermark claims that the written agreement relied upon by Evoqua did not actually assign the copyrights. Thus, *Eden Toys* does not apply. *Cf. Tempest Publ'g v. Hacienda Records & Recording Studio, Inc.*, No. H-12-736, 2013 WL 5964516, at *13 (S.D. Tex. Nov. 7, 2013) (distinguishing *Eden Toys* where the original agreements were "valid and sufficient writings under § 204(a)," but they did not transfer rights to the copyrights at issue).

*John G. Danielson* is also inapplicable. In that case, the court found that a written agreement properly transferred the copyrights at issue to the plaintiff. 186 F. Supp. 2d at 12. The court cited the rule in *Eden Toys* merely to reinforce this finding, because the parties to the agreement later affirmed that the rights had been transferred. *Id.*

Here, in contrast, the Carve-Out Agreement did not transfer the copyrights at issue. Thus, unlike the *John G. Danielson* case, there is no prior agreement assigning the copyrights that Evoqua and Siemens Industry can affirm. Their affidavits do not change the meaning of the Carve-Out Agreement.

Evoqua also relies on a "presumption" that it owns the copyrights because it has registered them with the Copyright Office. A certificate of registration "made before or within five years after first publication of the work" is "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Consequently, a certificate denominating a party as the author and copyright claimant is "prima facie" evidence of its ownership of the copyright. *BancTraining Video Sys. v. First Am. Corp.*, No. 91-5340, 1992 WL 42345, at *3 (6th Cir. Mar. 3, 1992).

The parties dispute whether this presumption applies because there is evidence indicating that Evoqua obtained its registrations more than five years after publication of its works. In any case, whatever presumption of ownership that Evoqua enjoys by virtue of its registrations has been rebutted by the Carve-Out Agreement.

Finally, Evoqua argues that the Court must decide whether the copyright registrations are valid before it can decide whether Evoqua owns the copyrights at issue. According to Evoqua, the validity of its copyright registrations is a "jurisdictional question" requiring priority of treatment. (Evoqua's Br., ECF No. 170, PageID.7468.) Evoqua is mistaken. The registration requirement in the Copyright Act is a precondition to filing suit; it is not a jurisdictional requirement. *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010). Moreover, the Court need not decide whether the registrations are invalid because Evoqua's inability to demonstrate ownership of the copyrights resolves its claim of copyright infringement against Watermark.

## IV. Conclusion

For the reasons stated herein, the Court will grant Defendants' motion for summary judgment as to Count V of the First Amended Complaint. There is no genuine dispute that Evoqua does not own the copyrights that it seeks to enforce against Watermark. Consequently, Evoqua's claim of copyright infringement must fail.

In addition, the Court will unseal the Carve-Out Agreement, because that agreement is central to the Court's analysis in this Opinion, and the public has a right to know the basis for the Court's decision.

The Court will enter an Order consistent with this Opinion.

Dated:      March 26, 2018             /s/ Robert J. Jonker
                                       ROBERT J. JONKER
                                       CHIEF UNITED STATES DISTRICT JUDGE