UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

EVOQUA WATER TECHNOLOGIES
LLC,

          Plaintiff,

v.

M.W. WATERMARK, LLC, et al.,

          Defendants.
_____/

Case No. 1:16-cv-14

Honorable Robert J. Jonker

# **OPINION**

## I. PROCEDURAL HISTORY

Plaintiff Evoqua Water Technologies LLC ("Evoqua") brought this lawsuit against Defendants Michael Gethin and M.W. Watermark, LLC ("Watermark"), claiming trademark infringement and false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), and copyright infringement in violation of the Copyright Act, 17 U.S.C. § 101 et seq. The Court dismissed Evoqua's copyright claim on a motion for summary judgment, and the remaining claims proceeded to trial. Following a three-day jury trial, a jury held that Watermark, but not Gethin, was liable for trademark infringement. It awarded Evoqua damages of $0. (Jury Verdict, ECF No. 239.) The jury also found that the trademark infringement was not willful, and that Defendants did not engage in false advertising. (*Id.*)

Before the Court is Evoqua's motion for a permanent injunction (ECF No. 241), motion for judgment as a matter of law and/or a new trial on willful infringement, and for attorney's fees, costs, and enhanced damages (ECF No. 242), motion for judgment as a matter of law regarding Gethin's liability for infringement (ECF No. 243), motion for a new trial on damages

(ECF No. 244), and motion for judgment as a matter of law regarding Defendants' liability for false advertising (ECF No. 245). Also before the Court is Watermark's motion for attorney's fees (ECF No. 247). The Court denies all the motions.

## II. THE TRIAL CLAIMS

Evoqua and Watermark are competitors in the de-watering business. Gethin is the President of Watermark. Evoqua and Watermark both sell equipment, including sludge dryers and filter presses, that removes water from industrial waste ("sludge") to make the waste easier and less expensive to manage. They also sell replacement parts for used de-watering equipment originally manufactured and sold by themselves or by other companies.

### A. Trademark Claim

Evoqua claims that Gethin and Watermark infringed Evoqua's J-Mate trademark by selling sludge dryers named "DryMate" and by using the terms "J-Mate" and "JMate" on Watermark's website.

J-Mate is a trademark originally used by a company called JWI, Inc., for sludge dryers. JWI used a "J-" prefix to identify many of its products. In addition to J-Mate, JWI sold products using the trademarks "J-Press," "J-VAP," and "J-Spin." (Trial Tr. I, 51, ECF No. 258.) Gethin worked for JWI before leaving to start his own business. Many years later, Siemens acquired JWI's trademarks and some of its assets through a series of corporate transactions. Evoqua subsequently acquired the J-Mate mark in 2013, when Siemens spun-off its de-watering business division into a separate entity, Siemens Water Technologies, which later changed its name to Evoqua Water Technologies, the plaintiff in this action.

In 2012, before Evoqua came into being, Siemens decided to "exit" the market for J-Mate sludge dryers. Evoqua continued this plan in 2014, notifying its sales representatives of its

decision to discontinue the J-Mate product line. (Trial Tr. I, 56-58, 98-102.) Because of that decision, Evoqua did not advertise or sell any J-Mate dryers in 2014 or 2015. (*Id.* at 100; Trial Tr. II, 68-69, 100, ECF No. 256.)

Watermark refurbished and sold used J-Mate dryers. Some of its customers complained that they could no longer purchase a new J-Mate dryer from Siemens/Evoqua, so Watermark decided to develop and sell its own new sludge dryer that was similar to the J-Mate. (Trial Tr. II, 11.) Near the end of the development process for its sludge dryer, Watermark had not yet settled on a name for its product. Its sales representatives used different names when pitching the dryer to customers; some called it a "DryMark," others called it a "DryMate," and others simply referred to it as a sludge dryer. (Trial Tr. II, 8.) Gethin and his employees agreed that they should be consistent in how they referred to the dryer, but his sales representatives did not have a preference for which name to use. The only feedback that Gethin received was that one employee did not like the name DryMark. Consequently, Gethin settled on the name DryMate. (*Id.* at 9.)

Watermark officially announced its DryMate dryer through an email to customers in 2014. It received only six orders for new sludge dryers while using the name "DryMate." In May 2016, it changed the name of its dryer to "M.W. Watermark Continuous Sludge Dryer," in response to concerns raised by Evoqua. (Trial Tr. II, 16.) Of those original six dryers, only the first one shipped to the customer under the DryMate label. The other five shipped to the customer as M.W. Watermark Continuous Sludge Dryers. Watermark made a small profit on the sale of all six sludge dryers, but it sold the first dryer—the only one bearing the DryMate name—at a loss.

Watermark also used the terms "J-Mate" and "JMate" on its website in a few places. On one page, a blog post compared the DryMate dryer to the J-Mate dryer. Another page

3

discussing the DryMate dryer was titled, "Is it time to replace your sludge dryer?" Near the bottom of this page was a list of "tagged" terms, including J-Mate and JMate. In addition, Watermark developed a "search optimization" strategy for the term "J-Mate," the details of which were not explored at trial. Watermark removed all references to J-Mate from its website before trial, in response to concerns raised by Evoqua.

At trial, Evoqua did not present any proofs seeking damages for Watermark's use of J-Mate and JMate. Its damages expert testified only about Watermark's revenue from the sale of DryMate dryers.

### B. False Advertising Claim

Evoqua also claims that Defendants made a false advertising statement. Watermark sells replacement parts for Evoqua equipment. Evoqua's equipment contains parts that are made by third-party manufacturers. For instance, Evoqua's filter press contains a filter pump made by Haskel. Watermark acquired replacement parts from the same third-party manufacturers who supplied the equivalent parts to Evoqua, and then Watermark sold those parts (e.g., the Haskel filter pump) as "OEM parts" for Evoqua equipment. Watermark's website stated that it "features OEM parts" for J-Press, Siemens, U.S. Filter, and other entities associated with Evoqua's products. Evoqua claimed that this statement is literally false.

The parties dispute the meaning of the term "OEM part." They agree that OEM stands for original equipment manufacturer, but they disagree about whether the OEM is the maker of the parts or the manufacturer and seller of the equipment in which those parts are installed. At trial, two Evoqua employees expressed their opinions that, in the de-watering industry, the OEM is the manufacturer and seller of the equipment that uses the component parts. In other words, Evoqua is the OEM for the filter presses that it sells, and for all the component parts that go into

its filter presses, even though some of those parts are made by third parties. Thus, in Evoqua's view, an "OEM part" for an Evoqua filter press is a part that is sold by Evoqua, or with Evoqua's approval, even though anyone can buy the same part directly from the third-party manufacturer and then resell it, as Watermark did. (Trial Tr. I, 70-73, 103.)

Gethin, on the other hand, testified that an OEM part is one that is identical (same part number, same manufacturer) to the one in the original equipment. It does not matter whether the manufacturer of the equipment approves of the purchase or sale of that part. Thus, when Watermark purchases and sells the same Haskel pump that Siemens/Evoqua used in the original filter press, Watermark is selling an OEM part for that filter press. Indeed, Evoqua itself used the term "OEM part" in a manner consistent with Watermark's usage. On Evoqua's website, it advertised the sale of "OEM parts" for filter presses made by other entities. (Trial Tr. I, 190.)

### III. RULE 50: JUDGMENT AS A MATTER OF LAW

#### A. Standard

Rule 50 of the Federal Rules of Civil Procedure permits a court to grant judgment as a matter of law only if a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. Fed. R. Civ. P. 50(a)(1). Phrased differently, the question is "whether a party has produced evidence 'legally sufficient' to warrant a jury determination in that party's favor." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 n.5 (2007) (quoting Fed. R. Civ. P. 50(a)(1)). The standard for judgment as a matter of law under Rule 50 mirrors the standard for summary judgment under Rule 56 so that in ruling on a motion for judgment as a matter of law, a court must consider the entire record and draw all reasonable inferences in favor of the non-moving party. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000). A motion for judgment as a matter of law should be granted "only

if reasonable minds could not come to a conclusion other than one favoring the movant." *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996). When reviewing a motion for judgment as a matter of law, a court "does not weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury." *Arban v. West Publishing Corp.*, 345 F.3d 390, 400 (6th Cir. 2003).

**B. Applied**

1. Trademark Infringement

The verdict form did not ask the jury to distinguish between the DryMate and J-Mate theories of infringement. In the Court's view, a reasonable jury weighing the relevant factors could have gone for either side on either theory. The evidence was not so one-sided that a finding of infringement was necessary for either one. In both cases, some factors favored Plaintiff while others favored Defendants.[1] That is why the Court denied summary judgment and sent the issue to trial. The proofs at trial came in as expected, and the jury made its choice. There is no reason to disturb it.

*a. Willful Infringement*

The jury reasonably determined that any infringement was not willful, for several reasons. First, although Defendants were aware of the J-Mate mark, they believed that Evoqua was not using it for sludge dryers. Even Evoqua's own sales representatives thought that Evoqua was abandoning the business. They directed customers interested in a J-Mate sludge dryer to Watermark.

---

[1] Evoqua cites the analysis in this Court's vacated opinion of September 12, 2016 to argue that Watermark necessarily infringed the J-Mate mark. That decision is inapposite because the evidence before the Court at that stage of the proceedings is significantly different from the body of evidence presented to the jury.

Second, Watermark had reason to use J-Mate fairly and lawfully. It sold replacement parts for J-Mate dryers, as well as refurbished J-Mate dryers. It also sold a sludge dryer that was similar to the J-Mate dryer. The jury could have reasonably concluded that Watermark intended to use the term J-Mate to fairly describe or compare its own products and services, rather than to confuse customers. Furthermore, given the size of the purchase, and the lead time for manufacture, the jury could reasonably have found that customers were unlikely to be confused about who was making and selling the machine.

Third, the jury could have determined that any infringement through use of the name DryMate was unintentional because Defendants decided on this name through an informal process at a time when they believed Evoqua was abandoning the dryer business. In naming the DryMate sludge dryer, Defendants also avoided any use of the "J-" prefix that is characteristic of Evoqua's trademarks. The jury could reasonably have weighed these facts against willfulness.

Finally, Watermark stopped using the terms J-Mate and DryMate soon after learning of Evoqua's concerns. The jury could have interpreted this response as evidence that any infringement was unintentional.

### b. Trademark Damages

The jury also reasonably concluded that Evoqua was not entitled to any damages. To the extent the jury found that Watermark's use of J-Mate was infringing, there was no concrete evidence of harm to Evoqua from this use. Evoqua's damages expert did not address this issue at all. He offered no opinion about Evoqua's damages from Watermark's use of J-Mate and JMate on its website or in its search optimization strategy. The jury was not required to accept the self-interested testimony of Evoqua's employees that Watermark's actions harmed Evoqua's business and goodwill. Thus, even if the jury found that Evoqua's use of J-Mate was infringing, it was not

required to find any damages for that use because Evoqua never even attempted to quantify any such damages for the jury.

To the extent the jury found that Watermark's use of the DryMate name was infringing, the jury could have reasonably determined that Evoqua was not entitled to anything for disgorgement of profits, which is the only theory of damages that Evoqua presented to the jury. Watermark's proofs established a loss on the first dryer sale, and a modest profit on the total of six sales. Evoqua did not directly attack these proofs with an alternate lost profits analysis. Instead, it claimed that it was entitled to Watermark's gross revenue for the sale of all six sludge dryers that customers ordered when Watermark was using the name DryMate.

It was reasonable for the jury to limit the disgorgement remedy to Watermark's profits (or lack thereof) from the sale of the first sludge dryer, because that was the only dryer that shipped to a customer with a DryMate label. In other words, even if the sale of the first DryMate dryer was infringing, the jury could reasonably have concluded that the other five sales were not. A reasonable jury could conclude that the likelihood-of-confusion factors tilt in favor of Watermark when it used a different mark upon delivery and completion of the sale of a large and expensive piece of equipment like a sludge dryer.

Evoqua contends that the orders for all six DryMate dryers are sufficient to demonstrate infringement under a theory of "initial-interest confusion," citing *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 549 (6th Cir. 2005). Evoqua never presented any evidence of initial-interest confusion, however. Moreover, in *Gibson*, the Sixth Circuit made clear that the core question in initial-interest cases is the same as in other contexts, i.e., "whether the consumer might be misled about the source of the relevant product or service." *Id.* at 551. A reasonable jury could conclude that customers ordering a sludge dryer would take particular care,

8

and would not be misled about its source after receiving one with Watermark's label on it. *Cf. Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 213 (3d Cir. 1995) ("In the case of a relatively high-priced, single-purchase article, . . . there is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed.") (quotation marks omitted).

### c. Gethin's Personal Liability

Evoqua challenges the jury's determination Gethin was not personally liable for any infringement. Defendants assert that this challenge should be rejected because Evoqua did not preserve the issue and because Evoqua's arguments are meritless. The Court rejects Evoqua's motion on the merits and finds it unnecessary to address the procedural challenge.

The test for infringement is a multi-factor balancing test. *See Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). Some of the factors are the same for both Watermark and Gethin personally. These include things like the strength of the mark, evidence of actual customer confusion, and the like. But one factor necessarily requires a distinct inquiry for each defendant; namely, "the defendant's intent in selecting its mark." *Id.* The corporation's intent is fairly inferred from the total mix of information available to all the corporate decision-makers involved. But this does not mean that everyone involved in a corporate decision is automatically chargeable with the same knowledge and intention. If that were the case, individual officer or decision-maker liability would be automatic in every case. But the Court is not aware of any case so holding.

"It is well established that a corporate officer or agent is personally liable for torts committed by him even though he was acting for the benefit of the corporation." *A&M Records, Inc. v. MVC Distrib. Corp.*, 574 F.2d 312, 315 (6th Cir. 1978). However, the law does not require that an officer/individual be liable for every instance of infringement by a corporation. It was the

jury's job to weigh the facts and law for each defendant individually.  Here, the jury heard from Gethin personally, and in weighing his testimony together with all the other information of record, the jury could reasonably conclude that the corporate decisions involved were the product of group decisions within Watermark, and that Gethin's personal level of involvement and his personal intentions weighed against a finding of personal liability.  The testimony indicated that no one spent a lot of time thinking about the name.  Gethin discussed with his salespeople what names they were using with customers, who at the time believed that Evoqua was exiting the business.  Some reported using "DryMark."  Some used "DryMate."  The final selection had as much to do with one salesperson's opposition to "DryMark" as anything else.  The jury could reasonably have decided to hold only the company accountable for this and not Gethin personally.

2. False Advertising

Evoqua's false-advertising claim boiled down to a credibility contest between Evoqua's employees and Watermark's President.  A reasonable jury could conclude that Gethin's testimony was more credible.  That conclusion is supported by Evoqua's own use of the term OEM parts on its own website in a manner consistent with Watermark's usage.

Accordingly, Evoqua's motion for judgment as a matter of law will be denied.

IV. **RULE 59: NEW TRIAL**

Evoqua seeks a new trial on trademark damages and willful infringement.  Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial is warranted when "a jury has reached a 'seriously erroneous' result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015) (quoting *Holmes v. City of Massillon*, 78 F.3d 1041,

1045-46 (6th Cir. 1996)). Evoqua argues that the verdict is against the great weight of the evidence. "[G]ranting a new trial on this ground is a rare occurrence—it happens only when the verdict is said to be unreasonable." *Armisted v. State Farm Mut. Auto. Ins. Co.*, 675 F.3d 989, 995 (6th Cir. 2012).

In Evoqua's view, the jury disregarded "uncontroverted evidence" that Watermark earned a modest profit on the sale of the six DryMate sludge dryers. (Mot. for New Trial, ECF No. 244, PageID.8683.) Consequently, according to Evoqua, it is entitled to disgorgement of those profits, at the very least. In addition, Evoqua contends that there was "no legally sufficient evidentiary basis" for a jury to find anything other than willful infringement. (Mot. for J. as a Matter of Law or for a New Trial on Willful Infringement, ECF No. 242, PageID.8661.)

As explained in Section III, the jury's verdict on damages was a reasonable one. The jury could have reasonably determined that only the sale of the first DryMate dryer infringed the J-Mate mark. This dryer sold at a loss, so there were no profits to disgorge from Watermark. To the extent the jury found that Watermark's use of J-Mate on its website or in its search optimization strategy was infringing, Evoqua never attempted to quantify the harm caused by this use. Thus, the jury's verdict was not "seriously erroneous."

Likewise, for the many reasons set forth in Section III, the jury's verdict on willfulness was a reasonable one. Thus, a new trial is not warranted.

## V. OTHER MOTIONS

### A. Enhanced Trademark Damages

Evoqua asks the Court to increase the damages award under 15 U.S.C. § 1117(a). That statute permits a plaintiff to recover "damages sustained" for trademark infringement, "subject to the principles of equity." *Id.* When assessing damages, the Court can "enter judgment,

11

according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." *Id.* The Court cannot award enhanced damages in this case because the jury found that Evoqua's actual damages for trademark infringement is $0. Three times $0 is still $0, so the statute does not permit enhancement here.

In addition, equity does not support an enhancement. "[T]he Lanham Act gives little guidance on the equitable principles to be applied by a court in making an award of damages[.]" *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 174 (4th Cir. 2006). A court considering whether to increase the damage amount can consider a "range of factors," including "the defendant's intent to deceive, whether sales were diverted, the adequacy of other remedies, any unreasonable delay by the plaintiff in asserting its rights, the public interest in making the misconduct unprofitable, and 'palming off,' i.e., whether the defendant used its infringement of the plaintiff's mark to sell its own products to the public through misrepresentation." *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 343 (6th Cir. 2010). Here, there is no evidence that Defendants intended to deceive, that Evoqua's sales were diverted, or that Defendants used Evoqua's marks to sell their own products through misrepresentation. Moreover, the jury determined that any infringement was not willful. Thus, Evoqua's request for enhanced damages is denied.

### B. Evoqua's Attorney's Fees (Lanham Act)

The Lanham Act permits the Court to award attorney's fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117(a). This is not such a case. It does not "stand[] out" from others with respect to the "substantive strength" of Evoqua's case or "the manner in which the case was litigated." *See Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749,

1756 (2014) (discussing the meaning of "exceptional cases" in the identically-worded fee-shifting provision of the Patent Act, 35 U.S.C. § 285).

The jury's reasonable findings of no liability for Gethin; the absence of willful infringement; and $0 in damages vindicate the core defense case through trial. Moreover, as the Court has indicated, a reasonable jury weighing all the relevant factors for infringement could have decided all the issues in Defendants' favor. Thus, an award of attorney's fees under § 1117(a) is not warranted.

### C. Permanent Injunction

Evoqua requests entry of a permanent injunction preventing Watermark and its "principals, agents, servants, employees, attorneys, successors and assigns" from using Evoqua's registered trademarks, any mark confusingly similar thereto, or any component portions thereof. (*See* Proposed Injunction, ECF No. 241-1.)

Generally, in order to obtain a permanent injunction, a party must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court[.]" *Id.* Here, the factors weigh against a permanent injunction.

1. <u>Irreparable injury</u>

Irreparable injury "ordinarily follows when a likelihood of confusion or possible risk to reputation appears" from trademark infringement. *Wynn Oil Co. v. Am. Way Serv. Corp.*,

13

943 F.2d 595, 608 (6th Cir. 1991). In this case, Watermark stopped using the term DryMate in 2016. This was two years before the jury's verdict, and immediately in response to Evoqua's concerns. Watermark has used a different name ever since. It also removed pages on its website referring to J-Mate shortly after Watermark raised its concerns. In other words, Evoqua effectively obtained the relief it now seeks for almost two years, which diminishes the risk of future harm and obviates the need for an injunction to remedy past harm.

Evoqua is wrong to characterize Watermark as a "recalcitrant" party who has repeatedly violated the law. It is true that Gethin and Watermark entered into a settlement agreement and consent judgment with JWI in 2003, in which Gethin and Watermark agreed not to use marks containing a "J-" prefix. However, no court ever found that Gethin or Watermark had infringed JWI's trademark rights. Instead, Gethin and Watermark ceased the conduct that JWI complained about and settled the case. Here, too, Gethin and Watermark ceased the allegedly infringing conduct in response to Evoqua's concerns. Thus, the Court cannot discern a likelihood of confusion or risk to Evoqua's reputation in the absence of an injunction. This factor weighs in Watermark's favor.

2. Adequate remedy

The Court does not discern a need for equitable relief in addition to the damages award that Evoqua sought. The jury reasonably concluded that Evoqua was not entitled to any damages, which undercuts Evoqua's claim that it suffered any meaningful harm from Watermark's actions. In addition, as indicated above, Defendants stopped using the terms J-Mate and DryMate some time ago. An injunction at this stage would do little to remedy harm done in 2014 and 2015. Thus, this factor also weighs in Watermark's favor.

### 3. Balance of hardships

Evoqua purportedly seeks to ensure that Watermark will respect Evoqua's trademark rights, which the law already requires of Watermark. To the extent the injunction follows the requirements of the law, it does not impose a hardship on Watermark. But the proposed injunction does more. It imposes stringent restrictions and requirements on Watermark's use of Evoqua's trademarks, even where such use would not be confusing because it fairly describes products sold by Watermark, including replacement parts for the J-Mate dryer and refurbished J-Mate dryers.

On the other side of the scale, there does not appear to be a significant risk of hardship to Evoqua in the absence of an injunction. Thus, the balance of hardships favors Watermark.

### 4. Public interest

The public's interest would be disserved by the proposed injunction. Evoqua and Watermark are competitors. The public would not be served by a judicial order hindering Watermark's ability to fairly compete with Evoqua in the marketplace.

In short, the balance of factors favors Watermark. Accordingly, the Court will not issue a permanent injunction.

### D. Watermark's Attorney's Fees (Copyright Act, Lanham Act)

Watermark asks for reimbursement of its attorney's fees under the Copyright Act and the Lanham Act.

### 1. Copyright Act

The Copyright Act permits a court, in its discretion, to award reasonable attorney's fees to the "prevailing party." 17 U.S.C. § 505. Watermark is the prevailing party for Evoqua's

claim of copyright infringement. The Court dismissed Evoqua's claim after concluding that Evoqua could not demonstrate ownership of the copyrights at issue.

The Court may not award attorney's fees "'as a matter of course'; rather, a court must make a []particularized, case-by-case assessment." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1985 (2016) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994)). The Court can consider "'several non-exclusive factors'" when making this assessment, including "'frivolousness, motivation, objective unreasonableness[,] and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Id.* (quoting *Fogerty*, 510 U.S. at 534 n.19). The Court "may not treat prevailing plaintiffs and prevailing defendants any differently," but otherwise the Court has "wide latitude" to award fees based on the "totality of circumstances in a case" and "in light of the Copyright Act's essential goals." *Id.* at 1985, 1989.

The Court declines to award fees to Watermark in this instance. Evoqua's claim was not frivolous or unreasonable. Watermark has never denied using any of the works at issue, and there does not seem to be a genuine dispute that at least some of those works are protected by copyright. Although Evoqua failed to prove ownership of the copyrights, its litigating position was not objectively unreasonable. It did acquire *some* intellectual property assets (including trademarks, know-how, and software) from the previous owner of its business; its claim failed because it could not show that it acquired the particular assets necessary to bring its copyright claim.

Moreover, Watermark prevailed on the eve of trial only after the Court prompted the parties to provide further briefing regarding Evoqua's ownership of the copyrights. Earlier in the case, Watermark had apparently tried to obtain information from Evoqua about the chain of ownership of the copyrights, but Evoqua objected to Watermark's request. Watermark did not

16

bring this discovery dispute to the Court's attention, however. The Court might have resolved the copyright claim much sooner, and with less expense to the parties, if Watermark had done so.

Furthermore, there is no indication that Evoqua's motive for bringing its claim was wholly improper. By its own admission, Watermark obtained many materials from former Siemens/Evoqua employees, and possessed a trove of manuals for Evoqua products that Watermark copied, rebranded, and sold to its own customers. It was not unreasonable for Evoqua to view this as a concern, and to try to enjoin and/or seek recompense for Watermark's actions. Some of the evidence at trial suggested that Evoqua brought this action to squash a smaller market competitor, but there can be legitimate competitive reasons for enforcing legal rights against a competitor. Even if Watermark is a mosquito to an Evoqua elephant, the elephant is entitled to swat the mosquito when it tries to bite.

Finally, there is no compelling reason to award fees for purposes of compensation or deterrence. In short, considering all the circumstances, the Court will not award Watermark its attorney's fees under the Copyright Act.

2. Lanham Act

As indicated above, the Lanham Act permits the Court to award attorney's fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117(a). Watermark is the prevailing party for Evoqua's false-advertising claim.[2] Fees are not warranted, however, because this case does not "stand[] out" from others with respect to the "substantive strength" of Evoqua's claim or the manner in which the case was litigated. *See Octane Fitness, LLC*, 134 S. Ct. at 1756.

---

[2] To the extent Watermark or Gethin can also be considered the prevailing party on some or all of the trademark claims, the Court would make the same determination that a fee award is not warranted, for essentially the same reasons discussed herein.

17

Regarding the strength of the claim, the parties and their respective employees simply disagreed about the definition of a term that could mean different things in different contexts. Both parties' positions were plausible. In fact, Evoqua survived a motion for summary judgment on the issue. At trial, the parties essentially left the jury to decide which of their respective, self-interested witnesses were more credible. Neither party provided objective expert testimony or evidence for the jury to consider. Thus, Evoqua's claim was not so weak as to be exceptional.

Evoqua was not able to provide evidence of damages from Watermark's conduct; however, monetary damages are not always easy to prove in false-advertising cases, and sometimes an injunction is the only appropriate remedy. *See Lexmark Int'l, Inc. v. Static Control Elements, Inc.*, 572 U.S. 118, 135 (2014) ("Even when a plaintiff cannot quantify its losses with sufficient certainty to recover damages, it may still be entitled to injunctive relief under [15 U.S.C. § 1116(a).]"). Evoqua sought an injunction as well as damages. It was not unreasonable for Evoqua to pursue this relief even in the absence of concrete evidence of monetary harm.

Watermark notes that it changed its website in response to Evoqua's concerns; however, corrective actions do not immunize a defendant from possible liability for past conduct. Nor do they guarantee that the defendant will avoid infringing conduct in the future. Thus, Watermark's actions did not undercut the strength of Evoqua's case or impeach Evoqua's motive for bringing it.

Regarding the manner in which Evoqua litigated the case, and the asserted anti-competitive purpose in doing so, the Court does not find a basis for shifting fees. Watermark complains that Evoqua made several discovery requests that were more broad than necessary. However, there is no indication that Evoqua's requests meaningfully added to Watermark's fees

18

or expenses. Watermark simply objected to these requests and did not comply. There was definitely some evidence at trial suggesting that Evoqua thought that litigation was warranted simply because Evoqua could absorb the costs more easily than Watermark. But even if true, this does not detract from the good faith basis Evoqua had to pursue its claims. Evoqua did prevail on one of its claims—albeit without winning money damages. And the jury could reasonably have decided the other claims differently than in its verdict.

In short, after considering all the circumstances, the Court will not award Watermark its attorney's fees.

## VI. CONCLUSION

Plaintiff and Defendants are not only business competitors, but also stepchildren, in a way, fighting about the original business of a common corporate ancestor, JWI, Inc. Maybe the original family connections help explain why the parties appear locked in perpetual and mortal combat over what seems to outside observers—including most importantly, the jury—to be of limited economic value.

In the Court's view, both sides would be better served by ending their litigation and re-focusing their competitive energies in the marketplace. The Court sees the jury verdict as sending the same basic message. The Court sees no lawful basis on which to disturb the verdict, and no legal or equitable basis on which to grant additional relief to either party.

An order will enter consistent with this Opinion.

Dated:   November 5, 2018            /s/ Robert J. Jonker
                                     ROBERT J. JONKER
                                     CHIEF UNITED STATES DISTRICT JUDGE